## IN THE UNTIED STATES BANKRUPTCY COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| ED'S BEANS, INC.,  D/B/A | : | Bankruptcy Case No. 20-22974 |
| CRAZY MOCHA COFFEE AND | : | |
| KIVA HAN COFFEE | : | |
| | : | |
| Debtor. | : | Chapter 11 |
| | : | |
| | : | |
| _____ | : | |
| | : | Related Docket Nos. 440, 442, 446, 479, 486, |
| ED'S BEANS, INC.,  D/B/A CRAZY | : | 487 and 488 |
| CRAZY MOCHA, | : | |
| CRAZY MOCHA COFFEE, | : | Docket No.  525 |
| CRAZY MOCHA COFFEE COMPANY, | : | |
| KIVA HAN, KIVA HAN COFFEE, | : | |
| KH AND KHC, | : | |
| | : | Hearing Date: May 26, 2021 at 2:30 p.m. |
| Movant, | : | |
| | : | Response Date: May 17, 2021 |
| v. | : | |
| | : | |
| FIRST COMMONWEALTH BANK, | : | |
| AMERICAN EXPRESS BANK, | : | |
| CHTD COMPANY, SWIFT FINANCIAL, | : | |
| LLC AND U.S. SMALL BUSINESS | : | |
| ADMINISTRATION | : | |
| | : | |
| Respondents. | | |

## ORDER OF COURT AUTHORIZING AND APPROVING (I) THE SALE OF CERTAIN CRAZY MOCHA ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, INTERESTS, AND LIABILITIES PURSUANT TO 11 U.S.C. § 363 AND F.R.B.P. NOS. 2002 AND 6004 AND W.PA.LBR 6004-1 AND 9013-3 AND (II) CERTAIN BID PROCEDURES

And NOW, this   26th   day of   May  , 2021, upon consideration of the Motion for an

Order Authorizing and Approving: (I)  the Sale of Certain Crazy Mocha Assets Free and Clear of

All Liens, Claims, Encumbrances, Interests, and Liabilities Pursuant to 11 U.S.C. § 363 and

F.R.B.P. Nos. 2002 and 6004 and W.PA.LBR 6004-1 and 9013-3 and (II) Certain Bid Procedures [Dkt. 440] (the "**Sale Motion**")[1] and after notice and a hearing the Bankruptcy Court finds:

## JURSIDICTION

1.   The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law.

2.   This Bankruptcy Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.

3.   Venue is proper pursuant to 28 U.S.C. § 1409(a).

4.   This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

## NOTICE OF THE SALE HEARING AND SALE

5.   Service of the Sale Motion, Notice of Zoom Hearing ("**Sale Hearing**") and Response Deadline Regarding Motion for an Order Authorizing and Approving: (I) the Sale of Certain Crazy Mocha Assets Free and Clear of All Liens, Claims, Encumbrances, Interests, and Liabilities Pursuant to 11 U.S.C. § 363 and F.R.B.P. Nos. 2002 and 6004 and W.PA.LBR 6004-1 and 9013-3 and (II) Certain Bid Procedures [Dkt. 442] ("**Notice of Hearing**") and the Notice of Sale Free and Divested of All Liens, Claim and Encumbrances [Dkt. 446] (the "**Notice of Sale**") and Amended Notice of Sale Free and Divested of All Liens, Claim and Encumbrances [Dkt. 488] was proper, and no further notice is required.

6.   The notice of the sale of the Purchased Assets was reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Purchased Assets and the Sale Hearing.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

7.   Proper, timely, adequate, and sufficient notice of the Sale Motion, the Sale Hearing, the Notice of Hearing, Notice of Sale and the Amended Notice of Sale was provided in accordance with Bankruptcy Rules 2002 and 6004, and W.PA.LBR 6004-1 and 9013-3 and the requirements of this Bankruptcy Court, and no other or further notice of the Sale Motion, the Sale Hearing, Notice of Hearing, Notice of Sale and/or the Amended Notice of Sale is required.

8.   The marketing and solicitation of the Purchased Assets in connection with this sale were adequate and reasonable to obtain the highest and best price for the Purchased Assets.

9.   A reasonable opportunity to object or to be heard regarding the relief requested has been afforded to all interested persons and entities, including: (a) all parties who claim interests in or liens upon the Purchased Assets; (b) all governmental taxing authorities who have asserted, or as a result of the sale may assert a claim; and (c) all creditors.

10. The sale was duly advertised on the Court's website pursuant to W. PA. LBR 6004-1(c) by the posting of the Notice of Sale and Sale Motion on the EASI System on May 5, 2021, and by posting the Notice of Sale in the Pittsburgh Post-Gazette on May 6, 2021, and in the Pittsburgh Legal Journal on May10, 2021, as shown by the Proofs of Publication duly filed in the Bankruptcy Case[Dkt. 477 & 494].

## THE SALE

11. The Purchased Assets include certain of the Debtor's assets used in connection with owning and operating the following ten (10) Crazy Mocha coffee shops: (i) Store #3-Oakland; (ii) Store #4-Carnegie Library; (iii) Store #11-Steel Plaza T-Station; (iv) Store #14-The Pittsburgh Cultural Trust; (v) Store #15-Heritage Valley Sewickley; (vi) Store #16-Heritage Valley Beaver; (vii) Store #17-One Mellon Center; (viii) Store #22-Squirrel Hill;; (ix) Store #37-Sewickley; and (x)  Store #40-Brighton Rehabilitation Center (the "**Coffee Shops**").

12. The Purchased Assets include but not limited to the following, which are used in connection with owning and operating the Coffee Shops: inventory, supplies, intellectual property, furniture, fixtures, equipment, machinery, unexpired leases and contracts, permits, and goodwill.

13. All objections to the sale, if any, were heard and were resolved or overruled.

14. Pamela VonBergen, now by assignment Crazy Mocha, LLC, an Ohio Limited Liability Company, (the "**Buyer**"), was the stalking horse bidder with an opening offer to purchase the Purchased Assets in the total amount of $650,000.00 (the "**Purchase Price**").  The Buyer agreed to purchase the Purchased Assets in accordance with the terms and conditions of that certain Asset Purchase Agreement dated May 4, 2021, by and between the Debtor and the Buyer, which Asset Purchase Agreement was filed as the Second Amended Exhibit A to the Sale Motion [Dkt. 486] (the "**Stalking Horse APA**").

15. The bid procedures set forth in the Sale Motion (the "**Bid Procedures**") are fair and reasonable.

16. At the Sale Hearing, consistent with the Bid Procedures, the Bankruptcy Court asked if any person or entity was present who wished to present a higher and better offer for the Purchased Assets under substantially the same terms and conditions as the Stalking Horse APA.

17. At the conclusion of the Sale Hearing, the highest and best offer made for the Purchased Assets was made by Crazy Mocha, LLC, (the "**Successful Bidder**") for the amount of $650,000 (the "**Successful Bidder Purchase Price**").  The Successful Bidder has already entered into the Stalking Horse APA with the Debtor (now the "**Successful Bidder APA**").

18. Contemporaneously with the Sale Motion, the Debtor filed the Second Omnibus Motion Authorizing Debtor to Assume and Assign Unexpired Leases Pursuant to 11 U.S.C. § 365 of the Bankruptcy Code and F.R.B.P. RULE 6006(A) and (E) (the "**Motion to Assume and Assign**"),

and in conjunction with the Sale Hearing this Bankruptcy Court heard and approved the Motion

the Assume and Assign ("**Order Approving Motion to Assume and Assign**") approving the

assumption and assignment of the leases for the Coffee Shop locations..

19. The Successful Bidder Purchase Price offer by the Successful Bidder is the highest and

best offer made at the Sale Hearing and is a full and fair price for the Purchased Assets.

20. The highest and best price for the Purchased Assets is represented by the Successful Bidder

APA, and the Successful Bidder Purchase Price is fair and reasonable and constitutes fair

consideration under the Bankruptcy Code and applicable state law.

21. Sound business reason exists for the sale of the Purchased Assets.

22. Upon the issuance of the Sale Order the Debtor shall: (a) have full power and authority to

execute and deliver the Successful Bidder APA, to the extent not already executed, and all other

documents contemplated thereby; (b) the Debtor shall have the power and authority necessary to

consummate the transactions contemplated by the Successful Bidder APA, and (c) no other

consents or approvals shall be required to consummate the transactions contemplated by the

Successful Bidder APA.

23. Entry of this sale order approving and authorizing the Debtor to enter into and comply with

the terms of the Successful Bidder APA is, therefore, in the best interest of the Debtor, its

respective creditors, and the bankruptcy estate.

24. The sale of the Purchased Assets to the Successful Bidder is free and clear of any and all

liens, claims, interests, and encumbrances, including but not limited to any claims of successor

liability, except for the Assumed Liabilities (as defined in the Successful Bidder APA).

25. Prior to closing on the sale of the Purchased Assets, the Debtor will continue to maintain

the Purchased Assets and conduct the Coffee Shops in substantially the same manner that it has

been doing since the Petition Date.  The Debtor will use its reasonable best efforts to maintain and preserve intact the Coffee Shops and preserve the rights, goodwill, and relationships with employees, customers, lenders, suppliers, and any others having relationships with the Coffee Shops and the Crazy Mocha Business.

26. The Debtor submits that it is appropriate to sell the Purchased Assets free and clear of all liens, claims, interests, liabilities, and encumbrances except as set forth herein pursuant to Section 363(f) with any such liens, claims, interests, liabilities, and encumbrances (collectively the "**Liabilities**") attaching to the net sale proceeds of the Purchased Assets to the extent applicable.

27. Except as set forth in the Successful Bidder APA and herein, the Successful Bidder does not, and will not, assume or otherwise become liable for any debts, obligations, or liabilities of the Debtor or any other person or entity whatsoever and shall not have any successor liability relating to such sale to the fullest extent allowed under applicable law.

28. At all times relevant hereto the Debtor and the Successful negotiated the sale and the Stalking Horse APA in good faith as that term is used in Section 363(m) of the Bankruptcy Code and at arms' length.

29. The Debtor is not affiliated with the Successful Bidder, and the Successful Bidder APA was negotiated, proposed and entered into by the parties without any collusion, in good faith, from arms' length bargaining positions and for fair value.  Accordingly, the Successful Bidder is a good faith purchaser under Section 363(m) and in accordance with the requirements of *In re Abbots Dairies of Pennsylvania, Inc*., 788 F.2d 143 (3d Cir. 1986) and as such is entitled to the protections afforded thereby.

AND Now, upon consideration of the Sale Motion and the findings of this Bankruptcy Court:

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the sale of the Purchased Assets in accordance with the Successful Bidder APA to the Successful Bidder in the amount of the Successful Bidder Purchase Price is **GRANTED, AUTHORIZED, and APPROVED** and accordingly the Debtor shall be, and hereby is, permitted to consummate the sale of the Purchased Assets in accordance with, and consistent with, the terms of the Successful Bidder APA attached to this Sale Order as Exhibit "A".

**IT IS FURTHER ORDERED** that all objections to the Sale Motion or to the relief requested therein have been withdrawn, waived, settled, or overruled.

**IT IS FURTHER ORDERED** that the Successful Bidder Purchase Price was the highest and best offer made at the Sale Hearing as determined by the Bankruptcy Court and is a fair and reasonable price for the Purchased Assets.

**IT IS FURTHER ORDERED** that the Bid Procedures utilized for the sale of the Purchased Assets as set forth in the Sale Motion were fair and reasonable and are authorized and approved by this Bankruptcy Court.

**IT IS FURTHER ORDERED** that the Debtor is authorized to execute and deliver and empowered to perform under and consummate the Successful Bidder APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Successful Bidder APA and to take all further actions as may reasonably be requested by the Successful Bidder for the purpose of assigning, transferring, granting, conveying, and conferring to the Successful Bidder the Purchased Assets.

**IT IS FURTEHR ORDERED** that this Bankruptcy Court heard the Motion to Assume and Assign in conjunction with the Sale Motion and entered the Order Approving the Motion to

7

Assume and Assign in conjunction with this Sale Order approving the assumption and assignment of the leases for the Coffee Shop locations.

**IT IS FURTHER ORDERED** that the sale of the Purchased Assets to the Successful Bidder shall be free, clear, and divested of any and all liens, claims, and encumbrances except as set forth in the Successful Bidder APA and this Sale Order in accordance with Sections 105(a) and 363 of the Bankruptcy Code.

**IT IS FURTHER ORDERED** that prior to closing on the sale of the Purchased Assets, the Debtor will continue to maintain the Purchased Assets and conduct the Coffee Shops in substantially the same manner that it has been doing since the Petition Date.  The Debtor will use its reasonable best efforts to maintain and preserve intact the current operations related to the Coffee Shops and preserve the rights, goodwill, and relationships with employees, customers, lenders, suppliers, and any others having relationships with the Coffee Shops.

**IT IS FURTHER ORDERED** that said liens, claims, and encumbrances, to which the Purchased Assets are being sold free, clear and divested of, be and hereby are divested from the Purchased Assets, and, if any to the extent that are determined to be valid liens, claims, interests, and encumbrances they shall transfer and attach to the proceeds of the sale.

**IT IS FURTHER ORDERED** that each and every federal, state, and local governmental agency or department hereby is directed to accept any and all documents and instruments necessary to consummate the transactions contemplated by the Successful Bidder APA.

**IT IS FURTHER ORDERED** that the Successful Bidder does not and will not assume or otherwise become liable for any debts, obligations, or liabilities of the Debtor, any other person, or entity whatsoever except as set forth in this Sale Order and in the Successful Bidder APA.

**IT IS FURTHER ORDERED** that the Buyer is a purchaser in good faith in accordance

with *In re Abbots Dairies* and is entitled to all the protections afforded by the Bankruptcy Code

Section 363(m).

**IT IS FURTHER ORDERED** that in the absence of a stay, if the Successful Bidder

consummates the sale under the Successful Bidder APA at any time after entry of this Sale Order,

then, with respect to the Successful Bidder APA, the Successful Bidder shall be entitled to the

protection of the Bankruptcy Code Section 363(m) if this Sale order or an authorization contained

herein is reversed or modified on appeal.

**IT IS FURTHER ORDERED** that disbursement of the sale proceeds at closing shall be

as follows:

| | |
|---|---|
| Purchase Price: | $650,000.00 |
| LESS: | |
| First Commonwealth Bank (1st Lien) | ($200,000.00) |
| Aaron Fox Trust (Cure) | ($ 33,421.88) |
| Carnegie Library of Pittsburgh (Cure) | ($  3,500.00) |
| Heritage Valley Health System (Cure) | ($ 16,176.00) |
| One Village Square (Cure) | ($ 42,123.44) |
| Port Authority of Allegheny County (Cure) | ($ 13,227.00) |
| Bank of New York Mellon (Cure) | ($ 33,372.01) |
| Pittsburgh Cultural Trust (Cure) | ($ 39,659.00) |
| University of Pittsburgh | ($ 10,253.82) |
| TOTAL | ($391,733.15) |

Balance of funds:                                    **$258,266.85**

**IT IS FURTHER ORDERED** the balance of funds of $258,266.85 shall be held in the

Debtor's counsel's IOLTA Trust account and shall not be disbursed until further order of

this Court.   All parties rights in and to the balance of the funds being held, including

First  Commonwealth Bank, are reserved and preserved.

**IT IS FURTHER ORDERED** that the Debtor shall serve a copy of the within order on

each of the Respondents, their attorneys of record, if any, upon any attorney or party who answered

the Sale Motion and/or appeared at the Sale Hearing, the Successful Bidder and file a certificate of service.

**IT IS FURTHER ORDERED** that pursuant to W.PA.LBR.6004-1(c)(4), within seven (7) calendar days of the Closing Date, the Debtor shall file a report of sale.

**IT IS FURTHER ORDERED** that this Sale Order survives a dismissal or conversion of the above-captioned Bankruptcy Case.

**IT IS FURTHER ORDERED** that the extent there is a discrepancy or conflict with the terms of the Sale Motion, the Order Approving Motion to Assume and Assign, the Successful Bidder APA, the Stalking Horse APA and/or this Sale Order, the terms of this Sale Order shall control.

BY THE COURT:

Carlota M. Böhm
Chief United States Bankruptcy Court Judge

FILED
5/26/21 5:20 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## IN THE UNTIED STATES BANKRUPTCY COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| ED'S BEANS, INC.,  D/B/A | : | Bankruptcy Case No. 20-22974 |
| CRAZY MOCHA COFFEE AND | : | |
| KIVA HAN COFFEE | : | |
| | : | |
|     Debtor. | : | Chapter 11 |
| | : | |
| | : | |
| _____ | : | |
| | : | Related Docket Nos. 440, 442, 446, 479, 486, |
| ED'S BEANS, INC.,  D/B/A CRAZY | : | 487 and 488 |
| CRAZY MOCHA, | : | |
| CRAZY MOCHA COFFEE, | : | Docket No. _____ |
| CRAZY MOCHA COFFEE COMPANY, | : | |
| KIVA HAN, KIVA HAN COFFEE, | : | |
| KH AND KHC, | : | |
| | : | Hearing Date: May 26, 2021 at 2:30 p.m. |
|     Movant, | : | |
| | : | Response Date: May 17, 2021 |
|     v. | : | |
| | : | |
| FIRST COMMONWEALTH BANK, | : | |
| AMERICAN EXPRESS BANK, | : | |
| CHTD COMPANY, SWIFT FINANCIAL, | : | |
| LLC AND U.S. SMALL BUSINESS | : | |
| ADMINISTRATION | : | |
| | : | |
|     Respondents. | : | |

## EXHIBIT A – ASSET PURCHASE AGREEMENT

## ORDER OF COURT AUTHORIZING AND APPROVING (I) THE SALE OF CERTAIN CRAZY MOCHA ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, INTERESTS, AND LIABILITIES PURSUANT TO 11 U.S.C. § 363 AND F.R.B.P. NOS. 2002 AND 6004 AND W.PA.LBR 6004-1 AND 9013-3 AND (II) CERTAIN BID PROCEDURES

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**"), dated as of May 12th, 2021, is entered into between Ed's Beans, Inc., a Pennsylvania corporation ("**Seller**"), and Pamela VonBergen, an Ohio resident (including her assigns, "**Buyer**").

### RECITALS

WHEREAS, Seller filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Western District of Pennsylvania (the "**Bankruptcy Court**") at Bankruptcy No. 20-22974 (the "**Bankruptcy Case**") on October 19, 2020 (the "**Petition Date**") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, et seq (the "**Bankruptcy Code**");

WHEREAS, Seller is the operator of the Business (defined below);

WHEREAS, Seller desires to sell, and Buyer desires to purchase, the Purchased Assets (as defined below), through the use of sale procedures under 11 U.S.C. §363 and assumption and assignment procedure for executory contracts and unexpired leases under 11 U.S.C. §365; and

WHEREAS, Seller and Buyer desire to enter into this Agreement in order for Buyer to serve as a Stalking Horse Bidder (defined below).

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
#### DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause

1

the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Assigned Contracts**" has the meaning set forth in **Section 2.01(b)**.

"**Assignment and Assumption Agreement**" has the meaning set forth in **Section 3.03(a)(ii)**.

"**Assignment and Assumption of Lease**" has the meaning set forth in **Section 3.03(a)(iv)**.

"**Assumed Liabilities**" has the meaning set forth in **Section 2.03**.

"**Auction**" has the meaning set forth in **Section 3.01(b)**.

"**Bidding Procedures**" has the meaning set forth in **Section 3.01(c)**.

"**Bid Procedures/Sale Motion**" has the meaning set forth in **Section 3.01(c)**.

"**Bidding Procedures Order**" has the meaning set forth in **Section 3.01(c)**.

"**Bill of Sale**" has the meaning set forth in **Section 3.03(a)(i)**.

"**Books and Records**" means all books and records of the Business, including (if and to the extent customarily maintained by Seller, and in whatever form so maintained), but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets.

"**Business**" means the business of owning and operating the Coffee Shops, all under the name "Crazy Mocha Coffee Company" (or a shortened derivation thereof), which shops offer coffees, specialty coffees and drinks, teas, other drinks and bottled products, pastries, yogurts, pre-packaged salads, sandwiches, event catering and the like. To be free of doubt, the term Business does not include the Excluded Business Lines.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Pittsburgh, Pennsylvania are authorized or required by Law to be closed for business.

2

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Closing Certificate**" has the meaning set forth in **Section 7.03(e)**.

"**Closing**" has the meaning set forth in **Section 3.02**.

"**Closing Date**" has the meaning set forth in **Section 3.02**.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Coffee Shops**" means the eleven (11) coffee shops listed on Section 1 of the Disclosure Schedules.

"**Contracts**" means all contracts, Leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral, and used in the conduct of the Business as currently conducted.

"**Disclosure Schedules**" means each of the Disclosure Schedules to be delivered by Seller or Buyer hereunder as referenced throughout this Agreement or permitted hereunder, to be delivered and accepted by the other prior to or at (and as a condition of) Closing.

"**Encumbrance**" means any charge, interest, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Estate**" the bankruptcy estate of Seller.

"**Excluded Assets**" has the meaning set forth in **Section 2.02**.

"**Excluded Business Lines**" means Seller's following lines of business: (a) coffee bean roasting, (b) wholesale distribution of coffee beans and coffee-related products and equipment, and (c) international marketing of Crazy Mocha-branded coffee.

"**Financial Information**" has the meaning set forth in **Section 4.04**.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

3

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Intellectual Property**" means all of Seller's right, title and interest in and to (a) the Registered Mark, and (b) all copyrights, trade names, logos, internet domain names, rights in telephone numbers and advertising and promotional materials as are used in the Business as it is currently conducted, together with the goodwill connected with the use of and symbolized by, and all domestic registrations, applications and renewals for, any of the foregoing, as well as all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the foregoing, whether accruing before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages. To be free of doubt, the term Intellectual Property does not include any foreign or international trademarks, service marks, registrations, applications , renewals or other filings.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by Seller and used in the conduct of the Business as currently conducted.

"**Intellectual Property Assignments**" has the meaning set forth in **Section 3.03(a)(iii)**.

"**Inventory**" has the meaning set forth in **Section 2.01(a)**.

"**Knowledge of Buyer**" **or** "**Buyer's Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of Buyer's  chief executive officer.

"**Knowledge of Seller**" **or** "**Seller's Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of Edward H. Wethli, President of Seller.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leased Real Property**" has the meaning set forth in **Section 4.07**.

"**Leases**" has the meaning set forth in **Section 4.07**.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

4

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis.

"**Motion to Assume and Assign**" has the meaning set forth in **Section 3.01(e)**.

"**Order Approving Motion to Assume and Assign**" has the meaning set forth in **Section 3.01(e).**

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Purchase Price**" has the meaning set forth in **Section 2.04**.

"**Purchased Assets**" has the meaning set forth in **Section 2.01**.

"**Registered Mark**" means U.S. Patent and Trademark Office Service Mark, Principal Register for Crazy Mocha Coffee Company, Registration No. 5,678,632 (Registration Date: February 19, 2019).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Sale Approval Order**" has the meaning set forth in **Section 3.01(d).**

"**Sale Hearing**" means the hearing at which the Court in the Bankruptcy Case will consider approval of the sale and/or assignment of the Purchased Assets.

"**Sale Motion**" has the meaning set forth in **Section 3.01(d).**

"**Seller**" has the meaning set forth in the preamble.

"**Seller Closing Certificate**" has the meaning set forth in **Section 7.02(i).**

"**Seller's Accountants**" means Boyer & Ritter LLC.

"**Stalking Horse Bidder**" has the meaning set forth in **Section 3.01(c).**

"**Supply Agreement**" means that certain Supply Agreement entered into by Buyer and Seller, substantially in the form of Exhibit A attached hereto.

"**Tangible Personal Property**" has the meaning set forth in **Section 2.01(d)**.

"**Transaction Documents**" means this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignments, Assignment and Assumption of Leases, the Supply Agreement, any subordination agreement and the other agreements, instruments and documents required to be delivered at the Closing.

## ARTICLE II
### PURCHASE AND SALE

**Section 2.01   Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase and accept from Seller, free and clear of any Encumbrances, all of Seller's right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired prior to the Closing (other than the Excluded Assets), which are used in connection with the Business (collectively, the "**Purchased Assets**"), including, without limitation, the following:

(a)     all inventory and supplies of the Business set forth on **Section 2.01(a)** of the Disclosure Schedules ("**Inventory**").  Levels of Inventory between the date of this Agreement and the Closing Date shall remain substantially the same at each Leased Real Property;

(b)     all Contracts, including those set forth on **Section 2.01(b)** of the Disclosure Schedules (the "**Assigned Contracts**");

(c)     all Intellectual Property Assets, including the items set forth on **Section 2.01(c)** of the Disclosure Schedules;

(d)     all furniture, fixtures, equipment, machinery, tools, office equipment, supplies, computers, telephones and other tangible personal property of the Business, all as set forth on **Section 2.01(d)** of the Disclosure Schedules (the "**Tangible Personal Property**");

(e)     all Leases for the Leased Real Property, as set forth on **Schedule 4.07** of the Disclosure Schedule;

(f)     all Permits, if any, which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets;

(g)    all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

(h)    all prepaid expenses, credits, advance payments (excepting pro-rated prepaid rents under Leases covering periods from and after the Closing Date, for which Seller shall be reimbursed at Closing (**"Prepaid Rent"**)), claims, security deposits, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees;

(i)    all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets; and

(j)    all goodwill associated with the Business and its going concern value.

**Section 2.02  Excluded Assets.** Notwithstanding the foregoing, the Purchased Assets shall not include the following assets, which shall be retained by Seller (collectively, the "**Excluded Assets**"):

(a)    the originals of the Books and Records and all organizational documents, seals, minute or record books, Tax Returns, personnel records, invoices, files, documents, correspondence, historic promotional materials and other records having to do with Seller;

(b)    all Benefit Plans and assets attributable thereto, if any;

(c)    the assets, properties and rights specifically set forth on **Section 2.02(c)** of the Disclosure Schedules;

(d)    the rights which accrue or will accrue to Seller under the Transaction Documents;

(e)    cash (including cash received for deposit, whether or not cleared), bank accounts, money market funds, treasury bills and other cash equivalents as of the close of business on the day immediately preceding the Closing Date;

(f)    all accounts receivable, notes receivable, shareholder receivables and other receivables of the Business as of the close of business on the day immediately preceding the Closing Date;

(g)    any rights of Seller to any refunds or reimbursements of taxes with respect to any period ending on or before the Closing Date;

(h)    all insurance policies carried and maintained by Seller relating to the Business and Leased Real Property, including fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular liability and other casualty and property insurance maintained by Seller or its Affiliates, together with any right to receive refunds or premiums;

(i)    all deposits (excepting any security deposits under the Leases, which shall be assigned to Buyer with the Leases at Closing), reserves, prepaid taxes and other prepaid

items of Seller, except for the continued right to receive goods and services under any Assigned Contracts;

(j)     all tangible personal property or inventory of the Business transferred, disposed of or consumed in the ordinary course of business from the date hereof to the Closing Date;

(k)     all Actions of Seller arising out of or relating to pre-Closing Date facts, circumstances and/or transactions, including without limitation, all preference, fraudulent conveyance and other Actions of Seller or the Seller's Estate arising under Chapter 5 of the United States Bankruptcy Code,11 U.S.C. Section 101, *et seq* and all claims for refunds related to premiums paid for workers' compensation insurance;

(l)     all documents relating to the negotiation, documentation and Closing of the transactions contemplated hereby, including electronically stored information; and

(m)     all assets used in connection with the operation of the Excluded Business Lines.

**Section 2.03   Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge all Liabilities of Seller in respect of the Assigned Contracts set forth on **Section 2.01(b)** of the Disclosure Schedule, and no other obligation of Seller, to the extent that such Liabilities thereunder are required to be performed after the Closing Date (collectively, the **"Assumed Liabilities"**).

**Section 2.04     Purchase Price.** The purchase price for the Purchased Assets shall be Six Hundred Fifty Thousand and No/100 Dollars ($650,000.00) (the **"Purchase Price"**), and the assumption of the Assumed Liabilities, to be paid at Closing by wire transfer of immediately available funds into an account designated by Seller.

**Section 2.05   Allocation of Purchase Price.** Seller and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items, including goodwill) shall be allocated among the Purchased Assets for all purposes (including tax and financial accounting) as set forth in **Section 2.05** of the Disclosure Schedules. The parties agree to file all tax returns (including amended tax returns and claims for refund) and information reports in a manner consistent with such allocation. Each party shall cooperate with the other in preparing IRS Form 8594 for filing as required.

**Section 2.06   Third Party Consents.** To the extent that Seller's rights in connection with any Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any

such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Notwithstanding any provision in this **Section 2.06** to the contrary, Buyer shall not be deemed to have waived its rights under **Section 7.02(d)** hereof unless and until Buyer either provides written waivers thereof or elects to proceed to consummate the transactions contemplated by this Agreement at Closing.

## ARTICLE III
### AUCTION AND BIDDING PROCEDURES; CLOSING

### Section 3.01   Auction and Bidding Procedures.

(a)    **Bidding.**   The provisions of this Section will be incorporated into the Bidding Procedures Order (defined below).

(b)    **Auction.**  In accordance with the Bidding Procedures Order, Seller will sell the Purchased Assets at a public auction (the "**Auction**") utilizing the procedures specifically set forth in the Bidding Procedures Order.

(c)    **Bidding Procedures.**  Promptly following the Effective Date, Seller will file one or more motions (collectively, the "**Bid Procedures Motion**") with the Court in the Bankruptcy Case, in form and substance reasonably acceptable to Buyer, seeking entry of an order (the "**Bidding Procedures Order**") approving certain notice, auction and bid procedures relating to the sale of the Purchased Assets (the "**Bidding Procedures**"), which procedures shall provide designation of Buyer as the stalking horse bidder (the "Stalking Horse Bidder").

(d)    **Sale Motion.**   Promptly following the Effective Date, Seller will file one or more motions (collectively the "**Sale Motion**") seeking the entry of an order approving the sale of the Purchased Assets to Buyer free and clear of Encumbrances (the "**Sale Approval Order**") at the Sale Hearing.

(e)    **Motion to Assume and Assign.** Promptly following the Effective Date, Seller will file one or more motions (collectively the "**Motion to Assume and Assign**") seeking entry of an order approving the assumption and assignment of the Assigned Contracts which include the Leases (the "**Order Approving Motion to Assume and Assign**").

(f)    **Other Bids.**  Buyer acknowledges that, pursuant to the Bidding Procedures Order, Seller will solicit bids from one or more other prospective purchasers for the sale of

some or all of the Purchased Assets in accordance with the procedures set forth in the Bidding Procedures Order.

(g)    **Incremental bidding**. The first bid must be no less than the Purchase Price. Incremental bidding will then commence at increments of Twenty Thousand and No/100 Dollars ($20,000.00) thereafter.

(h)    **Waiver of Challenge Rights**. If, for any reason, Buyer is not the highest/successful bidder at the Auction and/or does not ultimately acquire the Purchased Assets at Closing, Buyer agrees that, in consideration for consideration provided hereunder and under the Sale Motion and Bidding Procedures Order, it shall not challenge, attempt to prevent, hinder, delay or frustrate Seller's transfer of any or all of the Purchased Assets to another transferee/purchaser, and absent any intentional misconduct on the part of Seller, Buyer hereby irrevocably waives any all rights to bring such a challenge.    Buyer acknowledges that Seller and the Purchased Assets will be irreparably harmed by Buyer's failure to comply with this provision of the Agreement and agrees that Seller shall be entitled to equitable relief against Buyer in the form of an injunction, specific performance, or otherwise. This provision does not alter the obligation of the Buyer to have shared all the information acquired through its due diligence in an electronic virtual room or electronic war room.

Section 3.02    **Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Leech Tishman Fuscaldo & Lampl, LLC, 525 William Penn Place, Pittsburgh, PA, at 10:00 AM, local time, on the second Business Day after all of the conditions to Closing set forth in **Article VII** are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**". For convenience, the parties hereto agree that the Closing may take place by the exchange of electronic signatures to the Closing documents, without the need for a face-to-face meeting.

Section 3.03    **Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    a bill of sale mutually acceptable to the parties (the "**Bill of Sale**") and duly executed by Seller, transferring the Tangible Personal Property included among the Purchased Assets to Buyer;

(ii)    an assignment and assumption agreement mutually acceptable to the parties (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

10

(iii)   one or more assignments mutually acceptable to the parties (the **"Intellectual Property Assignments"**) and duly executed by Seller, transferring all of Seller's right, title and interest in and to the Intellectual Property Assets to Buyer;

(iv)   with respect to each Lease, an Assignment and Assumption of Lease acceptable to the parties hereto and each landlord thereunder (each, an **"Assignment and Assumption of Lease"**) and duly executed by Seller;

(v)   an executed Supply Agreement;

(vi)   the Seller Closing Certificate; and

(vii)   such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)   At the Closing, Buyer shall deliver to Seller the following:

(i)   the Purchase Price plus any Prepaid Rent;

(ii)   the Assignment and Assumption Agreement duly executed by Buyer;

(iii)   with respect to each Lease, an Assignment and Assumption of Lease duly executed by Buyer;

(iv)   an executed Supply Agreement;

(v)   the Buyer Closing Certificate; and

(vi)   such other customary instruments, filings or documents, in form and substance reasonably satisfactory to Seller, as may be required to give effect to this Agreement.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this **Article IV** are true and correct as of the date hereof.

**Section 4.01   Organization and Qualification of Seller.** Seller is a corporation duly organized, validly existing and in good standing under the Laws of the Commonwealth of Pennsylvania and has full power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted.

**Section 4.02    Authority of Seller.** As evidenced by the execution and delivery of this Agreement by Seller, Seller has full power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its or his respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby are hereby likewise authorized. Assuming due authorization, execution and delivery by Buyer, this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms. When each other Transaction Document to which Seller is a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against Seller in accordance with its terms.

**Section 4.03    No Conflicts; Consents.** To Seller's Knowledge, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which either is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller; (c) except as set forth in **Section 4.03** of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets. Other than the Bidding Procedures Order and the Sale Approval Order, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 4.04    Financial Information.** Complete copies of the unaudited and unreviewed balance sheets of the Business as prepared by the Seller's Accountants for each of the years 2018 and 2019, as well as the Seller's state and federal tax returns for the years 2016, 2017, 2018 and 2019 (collectively, the **"Financial Information"**), have been delivered to Buyer. The Financial Information is based on the books and records of the Business, and fairly present the financial condition of the Business and the results of the

operations of the Business for the periods indicated. Seller maintains a consistent system of accounting for the Business.

**Section 4.05   Title to Purchased Assets.** Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets. Except as disclosed in **Section 4.05** of the Disclosure Schedules such Purchased Assets (including leasehold interests) are free and clear of Encumbrances.

**Section 4.06   Condition and Sufficiency of Purchased Assets.** The furniture, fixtures, machinery, equipment and other items of Tangible Personal Property included in the Purchased Assets are sold to Buyer in their "as is, where is" condition and state of repair. Notwithstanding the foregoing, Seller represents and warrants to Buyer that, except as disclosed in **Section 4.06** of the Disclosure Schedules to the contrary, the said Tangible Personal Property assets are currently and will on the Closing Date be in good operating condition and repair, reasonable wear and tear excepted, and are adequate for the uses to which they are currently being put, and none of such Tangible Personal Property is in need of maintenance or repairs, except for ordinary, routine maintenance and repair. The Purchased Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted. None of the Excluded Assets are material to the conduct of the Business.

**Section 4.07   Real Property.** **Section 4.07** of the Disclosure Schedules sets forth each Crazy Mocha store location leased by Seller and used in the conduct of the Business as currently conducted (together with all rights, title and interest of Seller in and to leasehold improvements relating thereto, and including, but not limited to, security deposits, reserves or prepaid rents paid in connection therewith, collectively, the "**Leased Real Property**"), and a true, accurate and complete list of all such leases, subleases, licenses, concessions and other agreements (whether written or oral and if "oral" a written summary prepared by Seller setting forth the accurate oral arrangement), including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property (collectively, the "**Leases**"). Seller has delivered to Buyer a true and complete copy of each Lease, which Buyer acknowledges having received. Seller is not in default of its obligations under the Leases and to the extent that any lessor represented by the Leases delivers any written notice, of an alleged default, or any other required notice represented by the Leases, Seller shall promptly deliver to Buyer copies of any such notices.

**Section 4.08   Intellectual Property.** Section 2.01(c) of the Disclosure Schedules lists all of the Intellectual Property Assets being sold pursuant to this Agreement. Seller has received no claim or notice from any Person to the effect that the rights or use of Seller

with respect to any of its Intellectual Property conflict with or infringe upon the rights of any other Person.

(a)    Seller has received no notice and is otherwise unaware that the conduct of the Business as currently and formerly conducted has infringed, misappropriated, diluted or otherwise violated the Intellectual Property or other similar rights of any Person. Seller is not aware that any other Person has infringed, misappropriated, diluted or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any Intellectual Property Assets.

(b)    There are no Actions settled, pending or, to Seller's Knowledge, threatened: (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by Seller in connection with the Business; (ii) challenging the validity, enforceability, registrability or ownership of any Intellectual Property Assets or Seller's rights with respect to any Intellectual Property Assets; or (iii) by Seller or any other Person alleging any infringement, misappropriation, dilution or violation by any Person of any Intellectual Property Assets.

**Section 4.09    Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 4.10    Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this **Article V** are true and correct as of the date hereof.

**Section 5.01    Organization of Buyer.** Buyer is an individual, but may form an entity to acquire the Purchased Assets. Should Buyer do so, such entity will at the Closing Date be duly organized, validly existing and in good standing under the laws of the state in which it was formed.

**Section 5.02    Authority of Buyer.** Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

**Section 5.03    No Conflicts; Consents.** To Buyer's Knowledge, the execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Buyer; or (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a Material Adverse Effect.

**Section 5.04    Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 5.05    Litigation.** There are no Actions pending or, to Buyer's Knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 5.06 Full Disclosure.** No representation or warranty by Buyer in this Agreement and no statement contained in any certificate or other document furnished or to be furnished to Seller pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE VI
### COVENANTS

**Section 6.01 Conduct of Business Prior to the Closing.** From the date hereof until the Closing, Seller shall (x) conduct the Business in the ordinary course of business consistent with past practice; and (y) use reasonable best efforts to maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business.

**Section 6.02 Access to Information.** From the date hereof until the Closing, Seller shall (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the Leased Real Property, properties, Purchased Assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) afford Buyer and its Representatives full and free access to and the right to interview all suppliers and creditors of the Business (and shall instruct such suppliers and creditors that Seller consents to such access and interviews); (c) furnish Buyer and its Representatives with such existing financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (d) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business. Any investigation pursuant to this **Section 6.02** shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Seller. Buyer will treat and hold as such any information it receives in connection with its activities hereunder as confidential and will maintain all such information in strict confidence; provided, however, that Buyer may disclose such information to its legal, tax and accounting advisors and financing sources (provided that such advisors and financing sources agree to maintain the confidentiality of such information). No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

### Section 6.03 Notice of Certain Events.

(a) From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i) any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in

the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in **Section 7.02** to be satisfied;

(ii) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii) any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(b) Buyer's receipt of information pursuant to this **Section 6.03** shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

### Section 6.04 Employees and Employee Benefits.

(a) Effective as of the Closing Date, Seller will terminate all of Seller's current employees employed at the Coffee Shops and pay their compensation, taxes and benefits through that date. Seller shall use commercially reasonable efforts to ensure that all such employees continue to work through the Closing Date. If Buyer so elects, Buyer may review personnel files and interview Seller's employees prior to Closing to determine, in Buyer's sole discretion, whether to offer employment to Seller's former employees following Closing on an "at will" basis under terms determined by Buyer. Nothing set forth herein shall be construed to imply that Buyer shall have any obligation to employ, or to continue to employ, Seller's current employees employed at the Coffee Shops or maintain in effect any specific fringe benefits or that such employees shall be offered employment other than on an "at will" basis.

(b) Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, member, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to service with Seller at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date.

**Section 6.05 Confidentiality.** From and after the Closing, Seller shall hold, and shall use its reasonable efforts to cause its Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no disclosure by Seller or its Representatives; or (b) is lawfully acquired by Seller or its Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller

or its Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, *provided that* Seller shall use reasonable efforts, at no cost or expense to Seller, to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 6.06    Books and Records.**

(a)    In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, or for any other reasonable purpose, for a period of five (5) years after the Closing, Buyer shall:

(i)    retain the Books and Records (including personnel files) of Buyer relating to periods subsequent to the Closing in a manner reasonably consistent with the prior practices of Seller; and

(ii)    upon reasonable notice, afford Seller and/or Seller's Representatives reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such Books and Records.

(b)    In order to facilitate the resolution of any claims made by or against or incurred by Buyer after the Closing, or for any other reasonable purpose, for a period of five (5) years following the Closing, Seller shall:

(i)    retain the Books and Records (including personnel files) of Seller which relate to the Business and its operations for periods prior to the Closing; and

(ii)    upon reasonable notice, afford Buyer and/or Buyer's Representatives reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such Books and Records.

(c)    Neither Buyer nor Seller shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this **Section 6.06** where such access would violate any Law.

**Section 6.07    Closing Conditions** From the date hereof until the Closing, each party hereto shall use reasonable best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in **Article VII** hereof.

**Section 6.08    Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel) or made in connection with the Bankruptcy Case, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party

18

(which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 6.09  Bulk Sales Laws.** The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer; it being understood that any Liabilities arising out of the failure of Seller to comply with the requirements and provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction which would not otherwise constitute Assumed Liabilities shall be the responsibility of Seller.

**Section 6.10  Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

## ARTICLE VII
### CONDITIONS TO CLOSING

**Section 7.01  Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)      No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)      Seller shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in **Section 4.03** and Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in **Section 5.03**, in each case, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, order and approval shall have been revoked.

(c)      The Sale Approval Order shall have been entered as a final order at the Sale Hearing.

**Section 7.02  Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)      Other than the representations and warranties of Seller contained in **Section 4.01**, **Section 4.02**, and **Section 4.04**, the representations and warranties of Seller contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Seller contained in **Section 4.01**, **Section 4.02**, and **Section 4.04** shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)      Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)      No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)      All approvals, consents and waivers that are listed on **Section 4.03** of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(e)      From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(f)      Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.03(a)**.

(g)      Buyer shall have received all Permits that are necessary for it to conduct the Business as conducted by Seller as of the Closing Date.

(h)      All Encumbrances relating to the Purchased Assets shall have been released in full, and Seller shall have delivered to Buyer written evidence, in form satisfactory to Buyer in its sole discretion, of the release of such Encumbrances.

(i)       Buyer shall have received a certificate, dated the Closing Date and signed by on behalf of Seller, that each of the conditions set forth in **Section 7.02(a)** and **Section 7.02(b)** have been satisfied (the "**Seller Closing Certificate**").

(j)       Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 7.03   Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)       Other than the representations and warranties of Buyer contained in **Section 5.01, Section 5.02** and **Section 5.04**, the representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Buyer contained in **Section 5.01, Section 5.02** and **Section 5.04** shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)       Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)       No Action shall have been commenced against Seller or Buyer, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)       Buyer shall have delivered to Seller duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.03(b)**.

(e)       Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in **Section 7.03(a)** and **Section 7.03(b)** have been satisfied (the "**Buyer Closing Certificate**").

(f)       Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

21

## ARTICLE VIII
### TERMINATION

**Section 8.01    Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer by written notice to Seller if:

(i)    Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure has not been cured by Seller within ten (10) days of Seller's receipt of written notice of such breach from Buyer; or

(ii)    any of the conditions set forth in **Section 7.01** or **Section 7.02** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled within forty-five (45) days of the date hereof, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(c)    by Seller by written notice to Buyer if:

(i)    Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure has not been cured by Buyer within ten (10) days of Buyer's receipt of written notice of such breach from Seller; or

(ii)    any of the conditions set forth in **Section 7.01** or **Section 7.03** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled within forty-five (45) days of the date hereof, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)    by Buyer or Seller in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited, (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable, or (iii) Closing shall not have occurred within forty-five (45) days of the date hereof, unless such failure shall be due to a breach of this Agreement by the party seeking to terminate this Agreement pursuant to this **Section 8.01(d)(iii).**

**Section 8.02 Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a) as set forth in this **Article VIII** and **Section 6.05** and **Article IX** hereof; and

(b) that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

## ARTICLE IX
### MISCELLANEOUS

**Section 9.01 Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 9.02 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 9.02**):

If to Buyer:
Pamela VonBergen
3627 Devon Drive South East
Warren, Ohio 44484
Email: nca943@yahoo.com

with a copy to:
Tracie Schmidt
3801 Starrs Center Drive
Canfield, OH 44406
Email: Tschmidt@fandrlaw.com

23

If to Seller:                711 Thomson Park Drive
Cranberry Twp., PA 16066
E-mail: ed@kivahan.com

Attention: Edward H. Wethli

with a copy to:         Leech Tishman Fuscaldo & Lampl, LLC
525 William Penn Place, 28th Floor
Pittsburgh, PA  15219
E-mail: pfuscaldo@leechtishman.com

Attention: Pete A. Fuscaldo

**Section 9.03   Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 9.04   Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.05   Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.06   Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to

such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 9.07   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, however, that Buyer may assign this Agreement (and all its rights and obligations hereunder) to the Acquisition Entity without prior written consent of Seller. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 9.08   No Third-party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.09   Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.10   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)      This Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Pennsylvania or any other jurisdiction).

(b)      ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE COMMONWEALTH OF PENNSYLVANIA IN EACH CASE LOCATED IN ALLEGHENY COUNTY, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE

OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10(c).

**Section 9.11  Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.12  Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**[signature page follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above by their respective officers or members thereunto duly authorized.

**Ed's Beans, Inc.**

By: _____          _____
Name: Edward H. Wethli                              Pamela VonBergen
Title:  President

**EXHIBIT "A" TO ASSET PURCHASE AGREEMENT**

# COFFEE SUPPLY AGREEMENT

THIS COFFEE SUPPLY AGREEMENT (this **"Agreement"**), dated as of _May. 11_____, 2021 (the **"Effective Date"**), is entered into between _Crazy mocha_, a _____ company with an address at _2627 Devon Dr. Warren, OH_ (**"Buyer"**) and Ed's Beans, Inc. dba Kiva Han, a Pennsylvania corporation with an address at 711 Thomson Park Drive, Cranberry Township, PA 16066 (**"Seller"**, and together with Buyer, the **"Parties,"** and each, a **"Party"**).

WHEREAS, Buyer, among other things, owns or controls and operates certain retail coffee shops;

WHEREAS, Seller is in the coffee roasting and wholesale distribution business; and

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, Buyer's requirements of roasted coffee beans and certain other inventory and coffee shop supplies listed on Exhibit A (the **"Goods"**).

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.     Purchase and Sale. Buyer shall purchase exclusively from Seller, and Seller shall sell to Buyer, all of Buyer's requirements of the Goods.

2.     Non-Binding Forecasts of Buyer's Requirements. Buyer shall provide to Seller (i) not less often than once per calendar year, a forecast of its requirements of Goods during the next 12 months, and (ii) not less often than once every three calendar months, a forecast of its expected Goods usage during the next three months. Buyer shall notify Seller at least 30 days prior to any significant change in its actual monthly requirements. Forecasts are for informational purposes only and do not create any binding obligations on behalf of either Party.

3.     Purchase Terms. Buyer shall purchase the Goods from Seller at the prices and quantities set forth in, or determined in accordance with, Exhibit B (the **"Purchase Terms"**). The Purchase Terms shall also include periodic price or quantity modifications, if any, packaging and shipping costs.

4.     Most-Favored Customer. Seller shall not at any time sell goods identical to, or of the same quality and specifications as, the Goods (the **"Specifications"**) to a third party at prices below, or on materially more favorable terms than, those set forth in this Agreement. If Seller sells goods with the same Specification to a third party at a price below or on materially more favorable terms, Seller shall notify Buyer in writing, and immediately apply such lower price or more favorable terms for the Goods under this Agreement, effective as of the date of the third-party sale.

_CW RV_

5.      Payment. Payment shall be made net 21 days from Buyer's receipt of weekly invoices. Each such invoice shall contain Buyer's purchase order number and applicable bill of lading numbers, and shall show the delivered Goods, price and any applicable taxes. In the event of a payment dispute, Buyer shall deliver a written statement to Seller no later than 10 days prior to the date payment is due on the disputed invoice listing all disputed items. The Parties shall seek to resolve all such disputes expeditiously and in good faith. Each Party shall continue performing its obligations under this Agreement notwithstanding any such dispute.

6.      Purchase Orders. Buyer shall issue purchase orders to Seller via email or by other mutually acceptable manner. Seller shall confirm to Buyer the receipt of each purchase order, and within three days following Seller's receipt, notify Buyer of any anticipated delay in delivery, product shortage, or other performance issue. If Seller is unable to timely fulfill the purchase order in accordance with the terms of this Agreement, Buyer may purchase the Goods from an alternative supplier. If Seller fails to notify Buyer in accordance with this Section, Seller will be deemed to have accepted the purchase order.

7.      Shipment and Delivery. Seller shall deliver the Goods in the quantities and on the date(s) specified in the relevant purchase order or as otherwise agreed in writing by the parties.

8.      Title. Title passes to Buyer upon delivery of the Goods as specified under the purchase order.

9.      Acceptance of Goods. Within two days of receipt, Buyer shall inspect the Goods. Unless Buyer notifies Seller in writing of any nonconformities within 3 days of receipt, Buyer shall be deemed to have accepted the Goods without qualification, and cannot, thereafter, reject any Goods. Once used, Goods are deemed to be fully conforming to this Agreement.

10.     Warranties.

        (a)     Limited Warranty. Subject to the warranty limitation set forth in Section 10(b) below, Seller warrants that the Goods sold hereunder will substantially conform to the Specifications.

        (b)     Warranty Limitation and Disclaimer. The warranty and remedies for breach of warranty provided for in this Agreement do not cover, and Seller shall not be liable for (i) damage caused by use or handling which is improper or contrary to Seller's instructions, or (ii) improper storage of Goods, including storage of Goods unprotected from weather. All literature about the Goods is for illustrative purposes only and does not contain a warranty of any kind. THE WARRANTY SET FORTH IN SECTION 10(A) IS STRICTLY LIMITED TO ITS TERMS AND IS IN LIEU OF ALL OTHER WARRANTIES AND GUARANTEES, EXPRESS OR IMPLIED, ARISING BY OPERATION OF LAW, COURSE OF DEALING, USAGE OF TRADE OR OTHERWISE, SPECIFICALLY EXCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

        (c)     Sole Remedy. Buyer's sole and exclusive remedy, and Seller's only obligation for breach of warranty hereunder, shall be, at Seller's option in its sole discretion, to immediately (i) replace the defective Goods, free of charge, provided that Buyer

2



promptly notifies Seller of such defect prior to the end of the acceptance period described in Section 9 above, or (ii) issue a credit equal to the price of the defective Goods.

11.   LIMITATION OF LIABILITY.

(a)    IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF, OR RELATING TO, AND/OR IN CONNECTION WITH ANY BREACH OF THIS AGREEMENT, REGARDLESS OF (i) WHETHER SUCH DAMAGES WERE FORESEEABLE, (ii) WHETHER OR NOT SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, (iii) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED, AND (iv) THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

(b)    IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE TOTAL OF THE AMOUNTS PAID TO SELLER FOR THE GOODS SOLD HEREUNDER.

12.    Indemnification. Each Party (as "Indemnifying Party") shall indemnify, hold harmless, and defend the other Party and its successors and permitted assigns (collectively, "Indemnified Party") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, that are incurred by Indemnified Party (collectively, "Losses"), relating to any claim arising out of or occurring in connection with the Goods or the Indemnifying Party's negligence, willful misconduct, or material breach of this Agreement. The Indemnifying Party shall not enter into any settlement without the Indemnified Party's prior written consent.

13.    Confidentiality. From time to time during the Term, either Party may disclose or make available to the other Party information about its business affairs, products, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information (collectively, "Confidential Information"). Confidential Information shall not include information that is (i) in the public domain, (ii) known to the receiving Party at the time of disclosure, or (iii) rightfully obtained by the receiving Party on a non-confidential basis from a third party. The receiving Party shall use the Confidential Information solely to perform its obligations under this Agreement and shall not disclose any Confidential Information to any person or entity, except to the receiving Party's employees who have a need to know the Confidential Information for the receiving Party to perform its obligations hereunder. On the expiration or termination of this Agreement, the receiving Party shall promptly return to the disclosing Party all copies, whether in written, electronic, or other form or media, of the disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the disclosing Party that such Confidential Information has been destroyed.

3



14.    Force Majeure.

(a)    No Party shall be liable or responsible to the other Party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement (except for any obligations to make payments to the other Party hereunder), when and to the extent such Party's (the **"Impacted Party"**) failure or delay is caused by or results from the following force majeure events (**"Force Majeure Event(s)"**): (a) acts of God; (b) flood, fire, earthquake, epidemic, pandemic, or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest; (d) government order, law, or action; (e) embargoes or blockades in effect on or after the date of this Agreement; (f) national or regional emergency including without limitation, a health pandemic; (g) strikes, labor stoppages or slowdowns or other industrial disturbances; (h) shortage of adequate power or transportation facilities; and (i) other similar events beyond the control of the Impacted Party.

(b)    The Impacted Party shall give notice within 10 days of the Force Majeure Event to the other Party, stating the period of time the occurrence is expected to continue. The Impacted Party shall use diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The Impacted Party shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause.

(c)    Notwithstanding anything to the contrary, if a Force Majeure Event occurs which prevents the processing, handling, loading, or delivery by Seller of suitable Goods, Seller shall include in its notice of such Force Majeure Event to Buyer information on any alternative sources of Goods. Following receipt of such Force Majeure notice from Seller, Buyer shall advise Seller whether shipments of Goods from such alternative source are acceptable to Buyer. Should Buyer decide, for any reason whatsoever, that it does not desire shipments of Goods from Seller's alternative source, or if Buyer fails to respond to Seller within 3 days, then Seller's obligations to supply Goods shall be suspended until the Force Majeure Event is concluded.

(d)    Buyer shall be free to purchase Goods from third parties during any Force Majeure Event which impairs Seller's ability to supply Goods under this Agreement. After the Force Majeure Event is concluded, (i) Buyer may, at its option, require Seller to supply Goods to make up any deficiency in the quantities of the Goods procured by Buyer during said Force Majeure Event and (ii) Buyer shall terminate all deliveries from third parties as soon as reasonably practical, but in no event later than 30 days after the effective date of resumed performance.

15.    Term. This Agreement will be for an initial term of seven (7) years starting on the Effective Date (the **"Initial Term"**) and will be automatically renewed for successive one-year periods (each a **"Renewal Term"** and, together with the Initial Term, the **"Term"**). After the Initial Term, either Party may elect not to renew this Agreement upon written notice to the other Party no less than 30 days prior to the end of any Renewal Term.

4

16.    Termination. Either Party may terminate this Agreement upon notice to the other Party:

(a)    except as otherwise specifically provided under this Agreement, if the other Party is in material breach of this Agreement and either the breach cannot be cured or, if the breach can be cured, it is not cured within 60 days following the other Party's receipt of notice of such breach; and

(b)    if the other Party:

(i)    becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due;

(ii)    files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law;

(iii)    seeks reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts;

(iv)    makes or seeks to make a general assignment for the benefit of its creditors; or

(v)    applies for or has a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

17.    Miscellaneous.

(a)    Each Party shall deliver all communications in writing either in person, by certified or registered mail, return receipt requested and postage prepaid, by facsimile or email (with confirmation of transmission), or by recognized overnight courier service, and addressed to the other Party at the addresses set forth above (or to such other address that the receiving Party may designate from time to time in accordance with this Section).

(b)    This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without giving effect to any conflict of laws provisions thereof.

(c)    Any legal suit, action, or proceeding arising out of this Agreement shall be instituted in the federal or state courts in each case located in Allegheny County, Pennsylvania. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY (i) CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE AFOREMENTIONED COURTS, (ii) WAIVES ANY OBJECTION TO THAT CHOICE OF FORUM BASED ON VENUE OR TO THE EFFECT THAT THE FORUM IS NOT CONVENIENT, AND (iii) WAIVES ANY RIGHT TO TRIAL BY JURY.

(d)      This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written or oral understandings, agreements, representations, and warranties with respect to such subject matter. In the event of conflict between the terms of this Agreement and the terms of any purchase order or other document submitted by one Party to the other, this Agreement shall control.

(e)      The invalidity, illegality, or unenforceability of any provision herein does not affect any other provision herein or the validity, legality, or enforceability of such provision in any other jurisdiction.

(f)      The Parties may not amend this Agreement except by written instrument signed by the Parties.

(g)      No waiver of any right, remedy, power, or privilege under this Agreement ("**Right(s)**") is effective unless contained in a writing signed by the Party charged with such waiver. No failure to exercise, or delay in exercising, any Right operates as a waiver thereof. No single or partial exercise of any Right precludes any other or further exercise thereof or the exercise of any other Right.

(h)      The Rights under this Agreement are cumulative and are in addition to any other rights and remedies available at law or in equity or otherwise, except as expressly provided in Section 10(c) to the contrary.

(i)      Neither Party may directly or indirectly assign, transfer, or delegate any or all of its rights or obligations under this Agreement, voluntarily or involuntarily, including by change of control, merger (whether or not such Party is the surviving entity), operation of law, or any other manner, without the prior written consent of the other Party. Any purported assignment in violation of this Section shall be null and void.

(j)      This Agreement is binding upon and inures to the benefit of the Parties and their respective successors and permitted assigns.

(k)      Except for the Parties, their successors and permitted assigns, there are no third-party beneficiaries under this Agreement.

(l)      Section 13 of this Agreement, as well as any other provision that, in order to give proper effect to its intent, should survive the expiration or termination of this Agreement, will survive such expiration or termination for the period specified therein, or if nothing is specified, for a period of 12 months after such expiration or termination.

(m)      This Agreement may be executed in counterparts.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed

Pamela VonBergen

By: _Pamela VonBergen_
Name:
Title: Owner

Ed's Beans, Inc.

By: _Edward Wilhli_
Name:
Title: President

## EXHIBIT A - GOODS

| | | | Notes | Grind | 16 oz.Retail Bags | 5 lb. | 5 lb. Bags | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Tier 1 - 500 lbs/week | Tier 2 - 1000 lbs/week | Tier 3 - 5000 lbs/week |
| Dark Roast | Burgh Blend | | Dark chocolate, almond | Whole Bean or ground | $8.99 | $44.95 | $40.46 | $38.21 | $35.96 |
| | Colombia | | Caramel, cherry, orange | Whole Bean or ground | $7.64 | $38.20 | $34.38 | $32.47 | $30.56 |
| | Dark Velvet | | Vanilla, dark chocolate | Whole Bean or ground | $8.49 | $42.45 | $38.21 | $36.08 | $33.96 |
| | Ethiopia | | Floral, lime, peach, raspberry | Whole Bean or ground | $8.49 | $42.45 | $38.21 | $36.08 | $33.96 |
| | Homer's Espresso | | Floral, milk chocolate, almond | Whole Bean or ground | $8.49 | $42.45 | $38.21 | $36.08 | $33.96 |
| | Kiva Han House Blend | | Brown sugar, orange | Whole Bean or ground | $7.64 | $38.20 | $34.38 | $32.47 | $30.56 |
| | Mexico | | Caramel, honey, milk chocolate, orange | Whole Bean or ground | $8.99 | $44.95 | $40.46 | $38.21 | $35.96 |
| | Palermo Blend | | Citrus, almond | Whole Bean or ground | $8.49 | $42.45 | $38.21 | $36.08 | $33.96 |
| | Sienna Blend | | Cherry, orange | Whole Bean or ground | $8.49 | $42.45 | $38.21 | $36.08 | $33.96 |

8

|  |  | Notes | Grind | 16 oz.Retail Bags | 5 lb. | Tier 1 - 500 lbs/week | Tier 2 - 1000 lbs/week | Tier 3 - 5000 lbs/week |
|---|---|---|---|---|---|---|---|---|
| Medium Roast | Brazil | Bakers chocolate, walnut | Whole Bean or ground | $ 8.99 | $ 44.95 | $ 40.46 | $ 38.21 | $ 35.96 |
|  | Colombia | Caramel, cherry, orange | Whole Bean or ground | $ 7.64 | $ 38.20 | $ 34.38 | $ 32.47 | $ 30.56 |
|  | Costa Rica | Almond, cocoa, lemon | Whole Bean or ground | $ 8.49 | $ 42.45 | $ 38.21 | $ 36.08 | $ 33.96 |
|  | Ethiopia | Floral, lime, peach, raspberry | Whole Bean or ground | $ 8.49 | $ 42.45 | $ 38.21 | $ 36.08 | $ 33.96 |
|  | Guatemala | Brown sugar, cherry, orange | Whole Bean or ground | $ 10.75 | $ 53.75 | $ 48.38 | $ 45.69 | $ 43.00 |
|  | Kenya | Grapefruit, pineapple, tangerine, watermelon | Whole Bean or ground | $ 9.99 | $ 49.95 | $ 44.96 | $ 42.46 | $ 39.96 |
|  | Lighthouse Blend | Cocoa, cranberry | Whole Bean or ground | $ 8.49 | $ 42.45 | $ 38.21 | $ 36.08 | $ 33.96 |
|  | Louis XIV Blend | Peach, milk chocolate | Whole Bean or ground | $ 8.49 | $ 42.45 | $ 38.21 | $ 36.08 | $ 33.96 |
|  | Mexico | Caramel, honey, milk chocolate, orange | Whole Bean or ground | $ 8.99 | $ 44.95 | $ 40.46 | $ 38.21 | $ 35.96 |
|  | Morning Blend | Milk chocolate, citrus | Whole Bean or ground | $ 7.64 | $ 38.20 | $ 34.38 | $ 32.47 | $ 30.56 |

| | | Notes | Grind | 16 oz.Retail Bags | 5 lb. | Tier 1 - 500 lbs/week | Tier 2 - 1000 lbs/week | Tier 3 - 5000 lbs/week |
|---|---|---|---|---|---|---|---|---|
| | Peru | Cocoa, cream, walnut | Whole Bean or ground | $ 8.99 | $ 44.95 | $ 40.46 | $ 38.21 | $ 35.96 |
| | Sumatra | Black licorice, dark chocolate, vanilla | Whole Bean or ground | $ 9.99 | $ 49.95 | $ 44.96 | $ 42.46 | $ 39.96 |
| | Tanzania | Cranberry, lime, milk chocolate | Whole Bean or ground | $ 8.49 | $ 42.45 | $ 38.21 | $ 36.08 | $ 33.96 |

| | | Notes | Grind | 16 oz.Retail Bags | 5 lb. | Tier 1 - 500 lbs/week | Tier 2 - 1000 lbs/week | Tier 3 - 5000 lbs/week |
|---|---|---|---|---|---|---|---|---|
| Decaf | Colombia | Cocoa, lemon | Whole Bean or ground | $ 7.64 | $ 38.20 | $ 34.38 | $ 32.47 | $ 30.56 |
| | House Blend | Caramel, milk chocolate, lemon | Whole Bean or ground | $ 8.99 | $ 44.95 | $ 40.46 | $ 38.21 | $ 35.96 |
| | Lighthouse Blend | Cocoa, cranberry | Whole Bean or ground | $ 8.99 | $ 44.95 | $ 40.46 | $ 38.21 | $ 35.96 |
| | Palermo Blend | Citrus, almond | Whole Bean or ground | $ 8.99 | $ 44.95 | $ 40.46 | $ 38.21 | $ 35.96 |
| | Sorvacci Blend | Caramel, citrus | Whole Bean or ground | $ 8.99 | $ 44.95 | $ 40.46 | $ 38.21 | $ 35.96 |

| | | Notes | Grind | 16 oz.Retail Bags | 5 lb. | Tier 1 - 500 lbs/week | Tier 2 - 1000 lbs/week | Tier 3 - 5000 lbs/week |
|---|---|---|---|---|---|---|---|---|
| French Roast | House Blend | Caramel, milk chocolate, lemon | Whole Bean or ground | $ 8.99 | $ 44.95 | $ 40.46 | $ 38.21 | $ 35.96 |

| | | Flavors | Grind | 16 oz.Retail Bags | 5 lb. | Tier 1 - 500 lbs/week | Tier 2 - 1000 lbs/week | Tier 3 - 5000 lbs/week |
|---|---|---|---|---|---|---|---|---|
| | Sienna Blend | Cherry, orange | Whole Bean or ground | $ 8.49 | $ 42.45 | $ 38.21 | $ 36.08 | $ 33.96 |
| | Sumatra | Black licorice, dark chocolate, vanilla | Whole Bean or ground | $ 9.99 | $ 49.95 | $ 44.96 | $ 42.46 | $ 39.96 |
| Flavored Coffee | Decaf | Butterscotch toffee, Caramel nut, Chocolate caramel, Chocolate cinnamon, Chocolate raspberry cream, Cinnamon, Cinnamon vanilla, Creme brulee, Pralines and cream, Hazelnut, Irish cream, Jamaican me crazy, French Vanilla, Nutty Irishman (Hazelnut and Irish cream), Pecan Fudge Brownie, Pecan Hazelnut, Pumpkin pie, Rainforest crunch, Raspberry Cream, Scottish Grogg (Butterscotch toffee, chocolate, caramel), Snickerdoodle, Toasted coconut, Vanilla pecan praline, White chocolate, White chocolate hazelnut | | $ 8.49 | $ 42.45 | $ 38.21 | $ 36.08 | $ 33.96 |
| | Medium Roast | | Whole Bean or ground | $ 7.64 | $ 38.20 | $ 34.38 | $ 32.47 | $ 30.56 |

11

## EXHIBIT B

## PURCHASE TERMS

COD payment terms for the first six months of this agreement. Net 30 payment terms granted thereafter.

## DISCLOSURE SCHEDULES

These Schedules and all attachments hereto (each of which is incorporated herein by this reference where indicated) constitute the **"Disclosure Schedules"** to the Asset Purchase Agreement, dated as of May ___, 2021 (the **"Agreement"**), by and among Ed's Beans, Inc., a Pennsylvania corporation (**"Seller"**), and Pamela VonBergen, an Ohio resident (including her assigns, **"Buyer"**). The section numbers used herein refer to the sections in the Agreement. Headings and subheadings have been inserted herein for convenience of reference only and shall not have the effect of amending or changing the express description hereof as set forth in the Agreement.

The inclusion of any information (including dollar amounts) in any section of these Schedules shall not be deemed to be an admission or acknowledgment by the Seller that such information is required to be listed in such section or is material to or outside the ordinary course of the business of the Seller, nor shall such information be deemed to establish a standard of materiality (and the actual standard of materiality may be higher or lower than the matters disclosed by such information). In addition, matters reflected in these Schedules are not necessarily limited to matters required by the Agreement to be reflected in the Schedules. Any such additional matters are set forth for informational purposes only and do not necessarily include (and shall not be deemed to include) other matters of a similar nature. The information contained in these Schedules are disclosed solely for purposes of the Agreement, and no information contained herein or therein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever (including, without limitation, any violation of applicable law or breach of contract).

Any information disclosed in these Schedules under any section number shall be deemed to be disclosed and incorporated in the Schedule under any other section to the extent the relevance of such information to such other section would be reasonably apparent to a reader of such information.

### Section 1

### Coffee Shops

1. Oakland University of Pittsburgh (Store No. 3) – 207 Oakland Avenue, Pittsburgh, PA 15203

2. Carnegie Library of Pittsburgh/Main (Store No. 4) – 4400 Forbes Avenue, Pittsburgh, PA 15213

3. Steel Plaza Subway Station (Store No. 11) – 500 Grant Street, Pittsburgh, PA 15219

4. Cultural Trust (Store No. 14) – 801 Liberty Avenue, Pittsburgh, PA 15222

5. Heritage Valley-Beaver (Store No. 15) – 1000 Dutch Ridge Road, Beaver, PA 15009

6. Heritage Valley-Sewickley (Store No. 16) – 720 Blackburn Road, Sewickley, PA 15143

7. One Mellon Center (Store No. 17) – 500 Grant Street, Pittsburgh, PA 15219

8. Squirrel Hill (Store No. 22) – 2100 Murray Avenue, Pittsburgh, PA 15217

9. UPMC-East (Store No. 29) – 2775 Mosside Boulevard, Monroeville, PA 15146

10. Sewickley (Store No. 37) – 417 Walnut Street, Sewickley, PA 15143

11. Brighton Rehab Center (Store No. 40) – 246 Friendship Circle #9704, Beaver, PA 15009



### Section 2.01(a)

#### Inventory

Inventory and supplies to be counted and finally determined by the parties prior to Closing. The following are the only stores operating as of January 31, 2021:

1. Heritage Valley-Sewickley

2. Heritage Valley-Beaver

~~3. UPMC-East~~ currently closed

4. Sewickley



## Section 2.01(b)

### Assigned Contracts

All Leases set forth on **Section 4.07** of the Disclosure Schedules.

### Section 2.01(c)

## Intellectual Property Assets

1. U.S. Patent and Trademark Office Service Mark, Principal Register for Crazy Mocha Coffee Company, Registration No. 5,678,632; Registration Date: February 19, 2019.

2. Registration of Fictitious Name ("Crazy Mocha Coffee Company") filed March 26, 2018 with the Pennsylvania Department of State at Entity Number 6688153.

3. Phone Numbers (see attached list for each Coffee Shop's office, store and other phone numbers).

4. Internet Domain Name(s):
   a. https://crazymocha.com/

5. Social Media:
   a. Facebook: @crazymochapgh
   b. Instagram: @crazymochapgh



## Attachment to Section 2.01(c)

### Store/Office and Other Phone Numbers

| Store Number & Neighborhood: | | Store Address: | Phone Number: |
|---|---|---|---|
| 3 | Oakland/University of Pittsburgh | 207 Oakland Avenue | 412-621-7440 |
| 4 | Carnegie Library of Pittsburgh | 4400 Forbes Avenue | 412-802-7766 |
| 11 | Steel Plaza Subway Station | 500 Grant Street | 412-434-0203 |
| 14 | Cultural Trust | 801 Liberty Avenue | 412-281-3940 |
| 15 | Heritage Valley-Sewickley | 720 Blackburn Road | 412-749-9470 |
| 16 | Heritage Valley-Beaver | 1000 Dutch Ridge Road | 724-775-0807 |
| 17 | One Mellon Center | 500 Grant Street | 412-281-1981 |
| 22 | Squirrel Hill | 2100 Murray Avenue | 412-521-1056 |
| 29 | UPMC-East | 2775 Mosside Boulevard | 412-357-3955 |
| 37 | Sewickley | 417 Walnut Street | 412-356-5984 |
| 40 | Brighton Rehab Center | 246 Friendship Circle | 724-775-7100 |



## Section 2.01(d)

### Tangible Personal Property

See attached list of Tangible Personal Property by store/location. There may be small variances up to $1,500 for any given store/location.



Schedule 2.01(d) - Tangible Personal Property - by Store

Asset List
Store        03    Oakland

| Exterior | Quantity | Description | Brand/Model |
|---|---|---|---|
| Chairs | 4 | Black | Uml |
| Tables | 2 | Round Metal | |
| Signs | 2 | A-Frame Logo Signs | |

| Interior Customer Seating | Quantity | Description | Brand/Model |
|---|---|---|---|
| Chairs | 6 | Short Metal Chairs | MTS |
| Chairs | 7 | Bar Stools | MTS |
| Tables | 3 | Standard Tables | MTS |
| Tables | 2 | Formica Bar Height Countertops | |
| Art | 1 | Picture Art | |

| Interior Bar/Sugar Area | Quantity | Description | Brand/Model |
|---|---|---|---|
| Pastry Case | 1 | 36 in Pastry Case | Federal Industries |
| Cabinetry | 1 | 10 ft of formica custom cabinetry | Kelly Custom Furniture |
| Bisc Glass Jars | 6 | Biscotti Jars | |
| Biscotti Jar Holder | 1 | Formica Jar Holder | |
| Pastry Display Fixtures | 6 | black/brown metal pastry holders | |
| POS System | 1 | IPAD, Square Stand, Cash Drawer, Printer | |
| Phone | 1 | Cordless Phone | |
| Espresso Machine | 1 | 2 Group Espresso Machine | La Cimbali |
| Espresso Grinder | 2 | Super Jolly Electric Grinders | Mazzer |
| Espresso Knock box | 1 | espresso knock box | |
| Steam Pitcher | 4 | Steam Pitcher | |
| Cup Holder | 2 | 4 Position Cup Holder | |
| Tamp | 1 | espresso tamp | |
| Undercounter Fridge | 2 | 36" in undercounter fridge | TRUE |
| Glass Door Fridge | 2 | 14 CFT Glass Door Fridge | Turbo Air - TGM 14 |
| Blenders | 1 | Blender | Vita Mix |
| Blender Pitcher | 1 | Blender Pitcher | |
| Coffee Grinder | 1 | Coffee Grinder | Bunn G1 |
| Coffee Brewer | 1 | Coffee Brewer | Fetco |
| Airpots | 6 | Airpots | Bunn |
| Toaster | 1 | 4 slice toaster | Waring |
| Paper Towel Holder | 1 | Paper Towel Holder | |
| Garbage Cans | 3 | Garbage Cans | |
| Menu Boards | 3 | Menu boards | |
| scale | 1 | scale for weighing coffee | escala |
| Radio Reciever | 1 | Radio Receiver with 2 speakers | |
| Condiment Area | 1 | Sugar Bar area no wheels | |

| Restrooms | Quantity | Description | Brand/Model |
|---|---|---|---|
| Garbage Cans | 1 | Garbage Cans | |

1

Schedule 2.01(d) - Tangible Personal Property - by Store

| | | | |
|---|---|---|---|
| Paper Towel Holder | 1 | Paper Towel Holder | |
| Toilet Paper Holder | 1 | Toilet Paper Holder | |

| Stockroom | Quantity | Description | Brand/Model |
|---|---|---|---|
| Freezer | 1 | Chest Freezer | 9 C FT GE |
| Glass Door Fridge | 2 | 14 CFT Glass Door Fridge | Turbo Air - TGM 14 |
| Ice Machine | 1 | Undercounter Ice Machine | Hoshizaki |
| racks | 1 | dunnage racks for cups | |
| Mop Bucket | 1 | Mop Bucket with ringer | |
| broom | 1 | | |
| dust pan | 1 | dust pan with stick | |
| 3 bowl sink | 1 | 3 bowl sink with 2 drainboards | |
| Shelviing | 1 | 5 Tier metal shelves | |



Schedule 2.01(d) - Tangible Personal Property - by Store

Asset List
Store   4   Carnegie Library of Pitt.

| Interior Bar/Sugar Area | Quantity | Description | Brand/Model |
|---|---|---|---|
| Pastry Case | 1 | 48 In Dual ZonePastry Case | Federal Industries |
| Bisc Glass Jars | 7 | Biscotti Jars | |
| Biscotti Jar Holder | 1 | Formica Jar Holder | |
| Pastry Display Fixtures | 6 | black/brown metal pastry holders | |
| POS System | 1 | IPAD, Square Stand, Cash Drawer, Printer | |
| Phone | 1 | Cordless Phone | |
| Espresso Machine | 1 | 2 Group Espresso Machine | La Cimbali |
| Espresso Grinder | 2 | Super Jolly Electric Grinders | La Cimbali |
| Espresso Knock box | 1 | espresso knock box | |
| Steam Pitcher | 4 | Steam Pitcher | |
| Cup Holder | 2 | 4 Position Cup Holder | |
| Tamp | 1 | espresso tamp | |
| Undercounter Fridge | 2 | 48" in undercounter fridge | TRUE |
| Glass Door Fridge | 1 | 5 CFT Glass Door Fridge | Turbo Air - TGM 5 |
| Blenders | 1 | Blender | Vita Mix |
| Blender Pitcher | 1 | Blender Pitcher | |
| Coffee Grinder | 1 | Coffee Grinder | Bunn G1 |
| Coffee Brewer | 2 | Coffee Brewer | Bunn |
| Airpots | 6 | Airpots | Bunn |
| Toaster | 1 | 4 slice toaster | Waring |
| Paper Towel Holder | 1 | Paper Towel Holder | |
| Garbage Cans | 3 | Garbage Cans | |
| Menu Boards | 1 | Menu boards | |
| scale | 1 | scale for weighing coffee | escala |
| Panini Press | 1 | Panini press | |
| Ice Machine | 1 | Undercounter | Scotsman |

| Stockroom | Quantity | Description | Brand/Model |
|---|---|---|---|
| Freezer | 1 | 16 CF Stand up Freezer | |

| EQUIPMENT NOT OWNED | Quantity | Owner | Location |
|---|---|---|---|
| 14 CF Drink Cooler | 1 | ? | In Stockroom |



Schedule 2.01(a) - Tangible Personal Property - by Store

Asset List
Store       11      Steel Plaza

| Interior Customer Seating | Quantity | Description | Brand/Model |
|---|---|---|---|
| Tables | 3 | Bar Tables | |

| Interior Bar/Sugar Area | Quantity | Description | Brand/Model |
|---|---|---|---|
| Bisc Glass Jars | 4 | Biscotti Jars | |
| Biscotti Jar Holder | 1 | Formica Jar Holder | |
| Pastry Display Fixtures | 6 | black/brown metal pastry holders | |
| POS System | 1 | IPAD, Square Stand, Cash Drawer, Printer | |
| Phone | 1 | Cordless Phone | |
| Espresso Machine | 1 | Super Automatic | Jada |
| Cup Holder | 2 | 4 Position Cup Holder | |
| Undercounter Fridge | 1 | 48" Undercounter Fridge | TRUE |
| scale | 1 | scale for weighing coffee | escala |
| Coffee Grinder | 1 | Coffee Grinder | Bunn G1 |
| Coffee Brewer | 1 | Coffee Brewer | Bunn |
| Airpots | 5 | Airpots | Bunn |
| Garbage Cans | 2 | Garbage Cans | |
| Menu Boards | 1 | Menu boards | |
| scale | 1 | scale for weighing coffee | escala |
| Cart | 1 | Stainless Steel Cart | |

| Stockroom | Quantity | Description | Brand/Model |
|---|---|---|---|
| Freezer | 1 | 16 CF Stand up Freezer | 9 C FT |
| Glass Door Fridge | 1 | 1 Door Glass Fridge | TGM 11 |
| Ice Machine | 1 | Ice Machine with storage bin | Scotsman |
| Mop Bucket | 1 | Mop Bucket with ringer | |
| broom | 1 | | |
| dust pan | 1 | dust pan with stick | |
| 3 bowl sink | 1 | 3 bowl sink with 2 drainboards | Aero |

4

Schedule 2.01(d) - Tangible Personal Property - by Store

Asset List
Store        14        Cultural Trust

| Exterior | Quantity | Description | Brand/Model |
|---|---|---|---|
| Sign | 1 | two-sided wind sign | |
| Sign | 1 | Neon Logo Sign | |

| Interior Customer Seating | Quantity | Description | Brand/Model |
|---|---|---|---|
| Chairs | 35 | Short Metal Chairs | MTS |
| Chairs | 4 | Bar Stools | MTS |
| Chairs | 2 | Leather | MTS |
| Tables | 12 | Table Height | MTS |
| Tables | 1 | coffee | |
| Display Racks | 2 | Display racks for coffee/travel mugs | Ikea |
| Signs | 3 | Logo Signs | |
| Art | 3 | art | |

| Interior Bar/Sugar Area | Quantity | Description | Brand/Model |
|---|---|---|---|
| Bisc Glass Jars | 7 | Biscotti Jars | |
| Biscotti Jar Holder | 1 | Formica Jar Holder | |
| Pastry Case | 1 | 5ft Pastry Case | Spartan |
| Undercounter Ice Machine | 1 | Undercounter Ice Machine | Manitowoc |
| Pastry Display Fixtures | 6 | black/brown metal pastry holders | |
| POIS System | 1 | iPAD, Square Stand, Cash Drawer, Printer | |
| Phone | 1 | Cordless Phone | |
| Espresso Machine | 1 | 2 Group Espresso Machine | Nuova Somonelli Aurella |
| Espresso Grinder | 2 | Super Jolly Electric Grinders | Mazzer |
| Espresso Knock box | 1 | espresso knock box | |
| Steam Pitcher | 4 | Steam Pitcher | |
| Cup Holder | 3 | 4 Position Cup Holder | |
| Tamp | 1 | espresso tamp | |
| Undercounter Fridge | 1 | 27" Undercounter Fridge | |
| Glass Door Fridge | 1 | 1 Glass Door Fridge | |
| Blenders | 2 | Blender | Vita Mix |
| Blender Pitcher | 2 | Blender Pitcher | |
| Coffee Grinder | 1 | Coffee Grinder | Bunn G1 |
| Coffee Brewer | 1 | Coffee Brewer | Fetco |
| Airpots | 6 | Airpots | Bunn |
| Toaster | 1 | 4 slice toaster | Waring |
| Paper Towel Holder | 1 | Paper Towel Holder | |
| Garbage Cans | 3 | Garbage Cans | |
| Menu Boards | 1 | Menu boards | |
| Cart | 1 | Stainless Steel Cart | |
| Table | 1 | Stainless Steel table | 36x24 |
| scale | 1 | scale for weighing coffee | escala |
| Cabinetry | 1 | 20ft Section of Formica Cabinetry | Kelly Custom Furniture |
| Speed Racks | 4 | Metal Speed Racks | |
| broom | 1 | | |
| dust pan | 1 | dust pan with stick | |
| 3 bowl sink | 1 | 3 bowl sink with 2 drainboards | |
| Radio Reciever | 1 | Radio Receiver with 3 speakers | Sony |
| Safe | 1 | Small digital safe | |
| Camera System | 1 | Analog Camera System with 2 Cameras | Everfocus |

| Restrooms | Quantity | Description | Brand/Model |
|---|---|---|---|
| Garbage Cans | 2 | Garbage Cans | |
| Paper Towel Holder | 2 | Paper Towel Holder | |
| Toilet Paper Holder | 2 | Toilet Paper Holder | |

| Stockroom | Quantity | Description | Brand/Model |
|---|---|---|---|
| Shelving | 4 | 5 Tier metal shelves | |
| Freezer | 1 | 16 CF Stand up Freezer | 9 CFT |
| Glass Door Fridge | 1 | 2 Door Glass Slider | Turbo Air 35 CFT |
| Mop Bucket | 1 | Mop Bucket with ringer | |
| Dunnage Racks | 2 | Dunnage Racks | |



5

Schedule 2.01(d) - Tangible Personal Property - by Store

Asset List

Store          15          HVS – Heritage Valley Sewickley.

| Interior Customer Seating | Quantity | Description | Brand/Model |
|---|---|---|---|
| Chairs | 3 | Short Metal Chairs | MTS |
| Chairs | 9 | Bar Stools | MTS |

| Interior Bar/Sugar Area | Quantity | Description | Brand/Model |
|---|---|---|---|
| Bisc Glass Jars | 6 | Biscotti Jars | |
| Biscotti Jar Holder | 1 | Formica Jar Holder | |
| Pastry Display Fixtures | 6 | black/brown metal pastry holders | |
| POS System | 1 | IPAD, Square Stand, Cash Drawer, Printer | |
| Phone | 1 | Cordless Phone | |
| Espresso Machine | 1 | 2 Group Espresso Machine | Nuova Somonelli Aurelia |
| Espresso Grinder | 2 | Super Jolly Electric Grinders | Mazzer |
| Espresso Knock box | 1 | espresso knock box | |
| Steam Pitcher | 4 | Steam Pitcher | |
| Cup Holder | 2 | 4 Position Cup Holder | |
| Tamp | 1 | espresso tamp | |
| Undercounter Fridge | 1 | 48" Undercounter Fridge | Victory |
| Glass Door Fridge | 1 | 5 CF Fridge | Turbo Air TGM5 |
| Blenders | 1 | Blender | Vita Mix |
| Blender Pitcher | 2 | Blender Pitcher | |
| Coffee Grinder | 1 | Coffee Grinder | Bunn G1 |
| Coffee Brewer | 1 | Coffee Brewer | Fetco |
| Airpots | 6 | Airpots | Bunn |
| Toaster | 1 | 4 slice toaster | Waring |
| Garbage Cans | 2 | Garbage Cans | |
| Menu Boards | 1 | Menu boards | |
| scale | 1 | scale for weighing coffee | escala |
| broom | 1 | | |
| dust pan | 1 | dust pan with stick | |
| Safe | 1 | Small digital safe | |
| Signs | 3 | Logo Signs | |

| Stockroom | Quantity | Description | Brand/Model |
|---|---|---|---|
| Shelviing | 1 | 5 Tier metal shelves | |
| Glass Door Fridge | 1 | 1 Door Glass Merchandiser | Turbo Air TGM14 |
| Dunnage Racks | 1 | Dunnage Racks | |

CW
PVB

Schedule 2.01(d) - Tangible Personal Property - by Store

Asset List
Store        16        HVB - Heritage Valley Beaver

| Interior Bar/Sugar Area | Quantity | Description | Brand/Model |
|---|---|---|---|
| Bisc Glass Jars | 5 | Biscotti Jars | |
| Biscotti Jar Holder | 1 | Formica Jar Holder | |
| Pastry Display Fixtures | 4 | black/brown metal pastry holders | |
| POS System | 1 | IPAD, Square Stand, Cash Drawer, Printer | |
| Phone | 1 | Cordless Phone | |
| Espresso Machine | 1 | 2 Group Espresso Machine | Nuova Somonelli Aurelia |
| Espresso Grinder | 2 | Super Jolly Electric Grinders | Mazzer |
| Espresso Knock box | 1 | espresso knock box | |
| Steam Pitcher | 4 | Steam Pitcher | |
| Cup Holder | 2 | 4 Position Cup Holder | |
| Tamp | 1 | espresso tamp | |
| Undercounter Fridge | 1 | 48" Undercounter Fridge | Victory |
| Glass Door Fridge | 1 | 14 CF Single Door Fridge | Turbo Air TGM14 |
| Blenders | 1 | Blender | Vita Mix |
| Blender Pitcher | 2 | Blender Pitcher | |
| Coffee Grinder | 1 | Coffee Grinder | Bunn G1 |
| Coffee Brewer | 1 | Coffee Brewer | Fetco |
| Airpots | 6 | Airpots | Bunn |
| Toaster | 1 | 4 slice toaster | Waring |
| Garbage Cans | 2 | Garbage Cans | |
| Menu Boards | 1 | Menu boards | |
| scale | 1 | scale for weighing coffee | escala |
| broom | 1 | | |
| dust pan | 1 | dust pan with stick | |
| Signs | 3 | Logo Signs | |

Schedule 2.01(d) - Tangible Personal Property - by Store

Asset List
Store    17    One Mellon Bank Center

| Interior Bar/Sugar Area | Quantity | Description | Brand/Model |
|---|---|---|---|
| Bisc Glass Jars | 7 | Biscotti Jars | |
| Biscotti Jar Holder | 2 | Formica Jar Holder | |
| Pastry Display Fixtures | 6 | black/brown metal pastry holders | |
| POS System | 2 | IPAD, Square Stand, Cash Drawer, Printer | |
| Phone | 1 | Cordless Phone | |
| Espresso Machine | 1 | 3 Group Espresso Machine | Nuova Somonelli Aurelia |
| Espresso Grinder | 2 | Super Jolly Electric Grinders | Mazzer |
| Espresso Knock box | 1 | espresso knock box | |
| Steam Pitcher | 4 | Steam Pitcher | |
| Cup Holder | 3 | 4 Position Cup Holder | |
| Tamp | 1 | espresso tamp | |
| Undercounter Fridge | 2 | 48" Undercounter Fridge | TGM 48 Turbo Air |
| Glass Door Fridge | 2 | Counter Top Drink Fridge | TGM 5 Turbo Air |
| Blenders | 1 | Blender | Vita Mix |
| Blender Pitcher | 2 | Blender Pitcher | |
| Coffee Grinder | 2 | Coffee Grinder | Bunn G1 |
| Coffee Brewer | 2 | Coffee Brewer | Fetco |
| Airpots | 14 | Airpots | Bunn |
| Toaster | 1 | 4 slice toaster | Waring |
| Garbage Cans | 3 | Garbage Cans | |
| Menu Boards | 2 | Menu boards | |
| Cart | 2 | 3-tier wheeled cart | |
| scale | 1 | scale for weighing coffee | escala |
| broom | 1 | | |
| dust pan | 1 | dust pan with stick | |
| Signs | 2 | Logo Signs | |

| Stockroom | Quantity | Description | Brand/Model |
|---|---|---|---|
| Glass Door Fridge | 1 | 1 Door Glass Cooler | Turbo Air TGM 14 |

Schedule 2.01(d) - Tangible Personal Property - by Store

Asset List
Store        12        Squirrel Hill

| Exterior | Quantity | Description | Brand/Model |
|---|---|---|---|
| Sign | 1 | two-sided wind sign | |
| Sign | 4 | Logo artwork | |
| Chairs | 4 | Black | Uml |
| Tables | 2 | Round Metal | Uml |
| Awning | 2 | 8 ft fabric awning | |

| Interior Customer Seating | Quantity | Description | Brand/Model |
|---|---|---|---|
| Chairs | 51 | Short Metal Chairs | MTS |
| Chairs | 4 | Bar Stools | MTS |
| Chairs | 3 | Leather | MTS |
| Tables | 19 | Table Height | MTS |
| Tables | 1 | coffee | |
| Signs | 9 | Logo Signs | |
| Art | 1 | art | |

| Interior Bar /Sugar Area | Quantity | Description | Brand/Model |
|---|---|---|---|
| Bisc Glass Jars | 7 | Biscotti Jars | |
| Biscotti Jar Holder | 1 | Formica Jar Holder | |
| Pastry Case | 1 | 5ft Pastry Case | Spartan |
| Undercounter Ice Machine | 1 | Undercounter Ice Machine | Hoshizaki |
| Pastry Display Fixtures | 6 | black/brown metal pastry holders | |
| POS System | 1 | IPAD, Square Stand, Cash Drawer, Printer | |
| Phone | 1 | Cordless Phone | |
| Espresso Machine | 1 | 3 Group Espresso Machine | Nuova Somonelli Aurelia |
| Espresso Grinder | 1 | Super Jolly Electric Grinders | Mazzer |
| Espresso Grinder | 1 | Espresso Grinder | Rancilio md50 |
| Espresso Knock box | 1 | espresso knock box | |
| Steam Pitcher | 4 | Steam Pitcher | |
| Cup Holder | 3 | 4 Position Cup Holder | |
| Tamp | 1 | espresso tamp | |
| Undercounter Fridge | 1 | 48" Undercounter Fridge | |
| Glass Door Fridge | 2 | 1 Glass Door Fridge | TGM-11 |
| Blenders | 2 | Blender | Vita Mix |
| Blender Pitcher | 2 | Blender Pitcher | |
| Coffee Grinder | 1 | Coffee Grinder | Bunn G1 |
| Coffee Brewer | 1 | Coffee Brewer | Fetco |
| Airpots | 6 | Airpots | Bunn |
| Toaster | 1 | 4 slice toaster | Waring |
| Paper Towel Holder | 1 | Paper Towel Holder | |
| Garbage Cans | 3 | Garbage Cans | |
| Menu Boards | 1 | Menu boards | |
| scale | 1 | scale for weighing coffee | escala |
| Cabinetry | 1 | 20ft Section of Formica Cabinetry | Kelly Custom Furniture |
| broom | 1 | | |
| dust pan | 1 | dust pan with stick | |
| 3 bowl sink | 1 | 3 bowl sink with 2 drainboards | |
| Radio Reciever | 1 | Radio Receiver with 3 speakers | Sony |
| Safe | 1 | Small digital safe | |
| Camera System | 1 | Analog Camera System with 3 Cameras | hikivision |

| Restrooms | Quantity | Description | Brand/Model |
|---|---|---|---|
| Garbage Cans | 2 | Garbage Cans | |
| Paper Towel Holder | 2 | Paper Towel Holder | |
| Toilet Paper Holder | 2 | Toilet Paper Holder | |

| Stockroom | Quantity | Description | Brand/Model |
|---|---|---|---|
| Shelving | 3 | 5 Tier metal shelves | |
| Freezer | 2 | Chest Freezer | 9 C FT |
| Glass Door Fridge | 2 | 1 Glass Door Fridge | TGM-11 |
| Mop Bucket | 1 | Mop Bucket with ringer | |
| Dunnage Racks | 3 | Dunnage Racks | |

9

Schedule 2.01(d) - Tangible Personal Property - by Store

Asset List
Store         29        UPMC East

| Interior Bar/Sugar Area | Quantity | Description | Brand/Model |
|---|---|---|---|
| Bisc Glass Jars | 5 | Biscotti Jars | |
| Pastry Case | 1 | 36 Inch Pastry Case | Tor-Rey |
| Undercounter Ice Machine | 1 | Undercounter Ice Machine | Hoshizaki |
| Pastry Display Fixtures | 6 | black/brown metal pastry holders | |
| POS System | 1 | IPAD, Square Stand, Cash Drawer, Printer | |
| Phone | 1 | Cordless Phone | |
| Espresso Machine | 1 | 2 Group Espresso Machine | Astoria Gloria |
| Espresso Grinder | 2 | Super Jolly Electric Grinders | Mazzer |
| Espresso Knock box | 1 | espresso knock box | |
| Steam Pitcher | 4 | Steam Pitcher | |
| Cup Holder | 3 | 4 Position Cup Holder | |
| Tamp | 1 | espresso tamp | |
| Undercounter Fridge | 1 | 48" Undercounter Fridge | |
| Glass Door Fridge | 1 | 1 Glass Door Fridge | TGM-22 |
| Blenders | 1 | Blender | Vita Mix |
| Blender Pitcher | 2 | Blender Pitcher | |
| Coffee Grinder | 1 | Coffee Grinder | Bunn G1 |
| Coffee Brewer | 1 | Coffee Brewer | Fetco |
| Airpots | 6 | Airpots | Bunn |
| Toaster | 1 | 4 slice toaster | Waring |
| Garbage Cans | 3 | Garbage Cans | |
| Menu Boards | 1 | Menu boards | |
| Cart | 2 | Stainless Steel Cart with wheels | |
| Table | 1 | Stainless Steel table | 36x24 |
| scale | 1 | scale for weighing coffee | escala |
| broom | 1 | | |
| dust pan | 1 | dust pan with stick | |
| Safe | 1 | Small digital safe | |

| EQUIPMENT NOT OWNED | Quantity | Owner | Location |
|---|---|---|---|
| 14 CF Drink Cooler | 1 | Scheniders | Adjacent to Cash Register |

Schedule 2.01(d) - Tangible Personal Property - by Store

Asset List
Store   37   Sewickley

| Exterior | Quantity | Description | Brand/Model |
|---|---|---|---|
| Chairs | 24 | Black | Umi |
| Tables | 8 | metal | Umi |
| Awning | 3 | 12 ft canvas | |

| Interior Customer Seating | Quantity | Description | Brand/Model |
|---|---|---|---|
| Chairs | 26 | Short Metal Chairs | MTS |
| Chairs | 8 | Bar Stools | MTS |
| Chairs | 8 | Leather | MTS |
| Tables | 15 | Table Height | MTS |
| Tables | 2 | coffee | |
| table top | 1 | custom walnut high table | Urban Tree |
| Display Racks | 2 | Display racks for coffee/travel mugs | Ikea |
| benches | 2 | walnut custom benches | Kelly Custom Furniture |

| Interior Bar/Sugar Area | Quantity | Description | Brand/Model |
|---|---|---|---|
| Bisc Glass Jars | 7 | Biscotti Jars | |
| Biscotti Jar Holder | 1 | Formica Jar Holder | |
| Pastry Case | 1 | Open Air Dual Pastry Case | Federal Industries |
| Pastry Display Fixtures | 6 | black/brown metal pastry holders | |
| POS System | 1 | IPAD, Square Stand, Cash Drawer, Printer | |
| Phone | 1 | Cordless Phone | |
| Espresso Machine | 1 | 2 Group Espresso Machine | Nuova Somonelli White E |
| Espresso Grinder | 2 | Electric Grinders | Nouva Simonelli |
| Espresso Knock box | 1 | espresso knock box | |
| Steam Pitcher | 4 | Steam Pitcher | |
| Cup Holder | 3 | 4 Position Cup Holder | |
| Tamp | 1 | espresso tamp | |
| Undercounter Fridge | 1 | 27" Undercounter Fridge | TUR-28 |
| Glass Door Fridge | 1 | 2 door glass slider | Bev Air LV-15 |
| Blenders | 2 | Blender | Vita Mix |
| Blender Pitcher | 2 | Blender Pitcher | |
| Coffee Grinder | 1 | Coffee Grinder | Bunn G1 |
| Coffee Brewer | 1 | Coffee Brewer | Fetco |
| Airpots | 6 | Airpots | Bunn |
| Toaster | 1 | 4 slice toaster | Waring |
| Paper Towel Holder | 1 | Paper Towel Holder | |
| Garbage Cans | 3 | Garbage Cans | |
| Menu Boards | 4 | Menu boards | |
| Table | 3 | Stainelless Steel table | 36x24 |
| scale | 1 | scale for weighing coffee | escala |
| Cabinetry | 1 | 12ft Section of Formica Cabinetry | Kelly Custom Furniture |
| Speed Racks | 4 | Metal Speed Racks | |
| broom | 1 | | |
| dust pan | 1 | dust pan with stick | |
| Safe | 1 | Small digital safe | |
| Camera System | 1 | Analog Camera System with 2 Cameras | Everfocus |
| Sugar Bar Area | 1 | 48 in sugar bar | Kelly Custom Furniture |
| Ice bin | 1 | wheeled ice bin | cambro |

| Restrooms | Quantity | Description | Brand/Model |
|---|---|---|---|
| Garbage Cans | 2 | Garbage Cans | |
| Paper Towel Holder | 2 | Paper Towel Holder | |
| Toilet Paper Holder | 2 | Toilet Paper Holder | |

| Stockroom | Quantity | Description | Brand/Model |
|---|---|---|---|
| Shelving | 3 | 5 Tier metal shelves | |
| Freezer | 1 | Chest Freezer | 9 CFT |
| Glass Door Fridge | 1 | 2 Door Glass Slider | Turbo Air 35 CFT |
| Mop Bucket | 1 | Mop Bucket with ringer | |
| Dunnage Racks | 1 | Dunnage Racks | |
| 3 bowl sink | 1 | 3 bowl sink with 2 drainboards | |
| Sonos | 1 | Sonos receiver | Sonos |
| Camera System | 1 | Digital Camera System with 4 Cameras | Hickvision |
| Ice Machine | 1 | Ice Machine with storage bin | Hoshizaki |

11

Schedule 2 01(d) - Tangible Personal Property - by Store

Asset List
Store          40          **Brighton**

| Interior Bar/Sugar Area | Quantity | Description | Brand/Model |
|---|---|---|---|
| Bisc Glass Jars | 7 | Biscotti Jars | |
| Biscotti Jar Holder | 1 | Formica Jar Holder | |
| Pastry Case | 1 | Open Air Dual Pastry Case | Federal Industries |
| Pastry Display Fixtures | 6 | black/brown metal pastry holders | |
| POS System | 1 | IPAD, Square Stand, Cash Drawer, Printer | |
| Phone | 1 | Cordless Phone | |
| Espresso Machine | 1 | 2 Group Espresso Machine | Nuova Somonelli Aurelia |
| Espresso Grinder | 2 | Super Jolly Electric Grinders | Mazzer |
| Espresso Knock box | 1 | espresso knock box | |
| Steam Pitcher | 4 | Steam Pitcher | |
| Cup Holder | 3 | 4 Position Cup Holder | |
| Tamp | 1 | espresso tamp | |
| Undercounter Fridge | 1 | 24" undercounter | TUC - 24 |
| Glass Door Fridge | 1 | 2 door glass slider | Bev Air LV-15 |
| Blenders | 1 | Blender | Vita Mix |
| Blender Pitcher | 2 | Blender Pitcher | |
| Coffee Grinder | 1 | Coffee Grinder | Bunn G1 |
| Coffee Brewer | 1 | Coffee Brewer | Fetco |
| Airpots | 6 | Airpots | Bunn |
| Toaster | 1 | 4 slice toaster | Waring |
| Paper Towel Holder | 1 | Paper Towel Holder | |
| Garbage Cans | 3 | Garbage Cans | |
| Menu Boards | 3 | Menu boards | |
| Cart | 1 | Stainless Steel Cart | |
| Table | 1 | Stainless Steel table | 60x24 |
| scale | 1 | scale for weighing coffee | escala |
| Speed Racks | 4 | Metal Speed Racks | |
| broom | 1 | | |
| dust pan | 1 | dust pan with stick | |
| Safe | 1 | Small digital safe | |

| Stockroom | Quantity | Description | Brand/Model |
|---|---|---|---|
| Shelviing | 2 | 5 Tier metal shelves | |
| Freezer | 1 | Chest Freezer | 9 C FT |
| Glass Door Fridge | 1 | 1 door glass merchandiser | True 14 CF |
| Dunnage Racks | 2 | Dunnage Racks | |
| Ice Machine | 1 | Ice Machine with Bin | Hoshizaki |



12

**Section 2.02(c)**

**Excluded Assets**

1. U.S. Patent and Trademark Office Trademark, Principal Register for Kiva Han, Registration No. 3,148,322; Registration Date: September 26, 2006.

2. All Tangible Personal Property located at the following stores/locations:

| Store Number & Neighborhood: | | Store Address: |
|---|---|---|
| 1 | Shadyside | 5830 Ellsworth Avenue |
| 2 | Bloomfield | 4525 Liberty Avenue |
| 9 | Gateway One | 420 Fort Duquesne Blvd |
| ~~11~~ | ~~T-Station~~ | ~~500 Grant Street~~ R? CW (included in purchase) NEW |
| ~~14~~ | ~~Cultural Trust~~ | ~~801 Liberty Avenue~~ |
| 21 | Alcoa | 425 Sixth Avenue  R? CW |
| ~~22~~ | ~~Squirrel Hill~~ | ~~2100 Murray Avenue~~ |
| 27 | Gateway Four | 444 Liberty Avenue |
| 30 | Station Square | 5 Station Square Drive |
| 32 | Baum | 5607 Baum Boulevard |
| 34 | Southpointe | 1900 Main Street, Suite 115 |
| 39 | Southside | 2729 East Carson Street |

3. The vehicles set forth on the attachment to this Disclosure Schedule.

4. For the avoidance of doubt, all Tangible Personal Property located in the warehouse at 711 Thomson Park Drive, Cranberry Township, Pennsylvania 16066.



### Attachment to Section 2.02(c)

**Vehicles**

1. 2012 Chevrolet K 1500 Suburban LT

2. 2008 Dodge Caliber RT FWD

3. 2015 Chevrolet Express G2500

4. 2012 Nissan NV 1500/2500

5. 2008 Honda Accord Touring

6. 2018 Nissan NV 200 2 SS/SV

7. 2019 Nissan Sentra

### Section 2.05

### Allocation of Purchase Price

To be finalized by the parties prior to Closing.

Inventory:

Store Fixtures, Furnishings, & Equipment:

Goodwill & Going Concern Value:



## Section 4.03

### Conflicts: Consents

1. First Commonwealth Bank and/or U.S. Small Business Administration in connection with the Paycheck Protection Program Loan, Economic Injury Disaster Loan and Commercial Loan and Line of Credit.

2. The United States Bankruptcy Court for the Western District of Pennsylvania in connection voluntary Chapter 11 bankruptcy petition filed on October 19, 2020 (Bankruptcy No. 20-22974).



## Section 4.05

### Title to Purchased Assets

As of the date of the Agreement, Buyer's assets are subject to the following encumbrances:

| Financial Statement No. | Filing Date | Lapse Date | Debtor | Secured Party |
|---|---|---|---|---|
| 2011030904502 | 03/08/2011 | 03/08/2021 | Ed's Beans, Inc. | First Commonwealth Bank |
| 2016052600060 | 05/25/2016 | 05/25/2021 | Ed's Beans, Inc. | First Commonwealth Bank |
| 2018031901240 | 03/19/2018 | 03/19/2023 | Ed's Beans, Inc. | First Commonwealth Bank |
| 2019022200609 | 02/22/2019 | 02/22/2024 | Ed's Beans, Inc. | American Express National Bank |
| 2019061800358 | 06/18/2019 | 06/18/2024 | Ed's Beans, Inc.; Kiva Han Coffee and Crazy Mocha Coffee | CHTD Company |
| 2020052801062 | 05/28/2020 | 05/28/2025 | Ed's Beans, Inc. | U.S. Small Business Administration |



Section A.00

Conditions and Sufficiency of Purchase Assets



## Section 4.07

### Leases

Store No. 3 (Oakland University of Pittsburgh) – 207 Oakland Avenue, Pittsburgh, PA 15203:

Lease Agreement dated June 21, 2017. Current lease term expires July 1, 2027.

Store No. 4 (Carnegie Library of Pittsburgh/Main) - 4400 Forbes Avenue, Pittsburgh, PA 15213:

Lease Agreement dated on or about December 18, 2003, as extended thereunder. Lease expired on September 23, 2017 and is currently year-to-year. Current lease term expires September 20, 2021.

Store No. 11 (Steel Plaza Subway Station) – 500 Grant Street, Pittsburgh, PA 15222:

License Agreement dated March 27, 2007, as extended and amended by First Amendment to License Agreement dated March 28, 2012, as further extended and amended by Second Amendment to License Agreement dated November 13, 2014 (currently year-to-year). Current lease term expires April 17, 2021.

Cultural Trust (Store No. 14) – 801 Liberty Avenue, Pittsburgh, PA 15222:

Lease dated September 14, 2007, as adjusted by Cultural Trust letter dated February 16, 2016 and extended by Cultural Trust letter dated November 13, 2017, and further extended in 2018 (lease extended through May 1, 2023, with a five-year option).

Store No. 15 (Heritage Valley-Sewickley) – 720 Blackburn Road, Sewickley, PA 15143
& Store No. 16 (Heritage Valley-Beaver) – 1000 Dutch Ridge Road, Beaver, PA 15009:

Lease Agreement dated January 18, 2008 (covers both locations; currently year-to-year). For each location, current lease term expires January 30, 2021.

Store No. 17 (One Mellon Center) – 500 Grant Street, Pittsburgh, PA 15219:

Lease Agreement (Commercial Lease) dated May 22, 2008, and extended in 2018 (lease extended through September 1, 2023, with a five-year option). Storage Space Lease Agreement dated May 27, 2008 (month-to-month lease).

Squirrel Hill (Store No. 22) – 2100-2102 Murray Avenue, Pittsburgh, PA 15217:

Indenture of Lease dated April 17, 2009, as extended by extension letter dated September 19, 2012. Current lease term expires April 30, 2024.

Store No. 29 (UPMC-East) – 2775 Mosside Boulevard, Monroeville, PA 15146:

Lease Agreement dated January 5, 2012, extended and amended by First Amendment to Lease dated April 29, 2016, as further extended and amended by Second Amendment to Lease dated August 10, 2017 (on a year-to-year basis). Current lease term expires June 1, 2021.

Store No. 37 (Sewickley) – 417 Walnut Street, Sewickley, PA 15143:

Commercial Lease Agreement dated January 22, 2015. Current lease term expires September 1, 2026.

Store No. 40 (Brighton Rehab Center) – 246 Friendship Circle #9704, Beaver, PA 15009:

Commercial Lease Agreement dated on or about February [undated], 2017. Current lease term expires April 1, 2022.

